# EXHIBIT A

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitral Tribunal

API INTERNATIONAL GROUP, LLC
Claimant and Counterclaim Respondent

against

HEFEI REACHEVER IMPORT AND EXPORT LTD.
First Respondent and Counterclaimant

and

CHINA EXPORT AND CREDIT INSURANCE CORPORATION
A/K/A SINOSURE A STATE-OWNED CHINESE EXPORT
CREDIT INSURANCE CORPORATION
Second Respondent

Case Number 01-20-0005-4078

FINAL AWARD

Mary E. Bartkus, Arbitrator

December 9, 2022

TABLE OF CONTENTS

I.      THE PARTIES AND COUNSEL                                          4

II.     AGREEMENT TO ARBITRATE AND CHOICE OF LAW                         5

III.    PROCEDURAL HISTORY OF THE ARBITRATION                            6

IV.     FACTUAL BACKGROUND                                              8
        A.      APIIG                                                    8
        B.      HRIECO                                                  10
        C.      Ginkgo Biloba Extract                                   10
        D.      APIIG and HRIECO: Manufacturers                         12
        E.      APIIG and HRIECO: 2017                                  13
                1.      US FDA Registration                             13
                2.      Purchase Orders                                 14
                3.      USP Acceptance Criteria                         14
        F.      APIIG and HRIECO: 2018                                  15
                1.      2018 Supply Agreements                          15
                2.      APIIG: Liptis USA Product Development           16
                3.      USP Acceptance Criteria                         16
                4.      Invoices from Liptis USA to Liptis Egypt        17

V.      CONTRACTS AND PERFORMANCE                                       18
        A.      2019 Supply Agreements: Contract Formation              18
                1.      Product, Price and Quantity Terms               18
                2.      The HRIECO-Dongling Agreement                   21
                3.      Drafts Exchanged                                21
                4.      Execution and Terms                             24
        B.      2019 Supply Agreements: Performance                     25
                1.      The First Shipment                              25
                2.      The Second Shipment                             27
                3.      The Third Shipment                              28
                4.      The Fourth Shipment                             32
                5.      The Fifth Shipment                              35
                6.      The Sixth Shipment                              36
        C.      Collection Efforts. No Commitment for 2020.             38
                1.      Late Payment for the Fourth Shipment            38
                2.      No Commitment for 2020                          39
                3.      No Payments for the Fifth and Sixth Shipments   40

        4.      HRIECO's Claim to Sinosure        41
    D.      Invoices from Liptis USA to Liptis Egypt      43

VI.    CONTENTIONS AND REQUESTS FOR RELIEF      43
    A.      APIIG's Contentions and Requests for Relief      43
    B.      HRIECO's Contentions and Requests for Relief      45
    C.      Sinosure's Position      45

VII.   ANALYSIS      46
    A.      Governing Law      46
    B.      Contract and Breach      46
        1.      The Parties' Contentions      46
        2.      Conclusions as to Manufacturer      47
        3.      Conclusions as to Product and Breach      49
        4.      Conclusions as to Sinosure      53
    C.      Damages      53
    D.      Attorneys' Fees and Expenses      54

VIII.   AWARD      56

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitral Tribunal

---

API INTERNATIONAL GROUP, LLC
Claimant and Counterclaim Respondent

against

HEFEI REACHEVER IMPORT AND EXPORT LTD.
First Respondent and Counterclaimant

and

CHINA EXPORT AND CREDIT INSURANCE CORPORATION
A/K/A SINOSURE A STATE-OWNED CHINESE EXPORT
CREDIT INSURANCE CORPORATION
Second Respondent

Case Number 01-20-0005-4078

## **FINAL AWARD**

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the dispute resolution provisions of supply agreements between API International Group, LLC and Hefei Reachever Import and Export Ltd., dated January 2, 2019, having been duly sworn, and having duly heard the proofs and evidence submitted, do hereby FIND and AWARD, as follows:

## I.     THE PARTIES AND COUNSEL

1.     Claimant and Counterclaim Respondent API International Group, LLC ("APIIG") is a limited liability company organized and existing under the laws of the State of New York, with business operations in Yonkers, New York.

2.      Respondent and Counterclaimant Hefei Reachever Import and Export Ltd. ("HRIECO"), is a corporation organized and existing under the laws of the People's Republic of China, with business operations in Hefei, Anhui Province, China.

3.      Second Respondent China Export and Credit Insurance Corporation ("Sinosure") is a state-owned export credit insurance corporation organized and existing under the laws of the People's Republic of China, with its principal office in Beijing, China.

4.      The Parties are represented as follows:

Counsel for Claimant and Counterclaim Respondent
Donald J. Feerick, Jr., Esq.
Patrick A. Knowles, Esq.
FEERICK LYNCH MACCARTNEY NUGENT, PLLC
96 South Broadway
South Nyack, New York 10960

Counsel for the First Respondent and Counterclaimant
Edwin Barnes, Esq.
THOMAS QUINN, L.L.P.
219 9th Street, Second Floor
San Francisco, California 94103

Counsel for the Second Respondent
Jean-Claude Mazzola, Esq.
Ruofei Xiang, Esq.
MAZZOLA LINDSTROM LLP
1350 6th Avenue, Second Floor
New York, New York 10019

## II.    AGREEMENT TO ARBITRATE AND CHOICE OF LAW

5.      The arbitration agreement governing this arbitration (the "Arbitration Agreement") is included in supply agreements between APIIG and HRIECO dated January 2, 2019 (the "2019 Supply Agreements") (C-1). The Arbitration Agreement provides:

"Dispute Resolution; Arbitration. All disputes in connection with this Supply Agreement or the execution thereof shall be settled amicably by negotiation. In case no settlement can be reached, the dispute shall be settled by arbitration administered by the American Arbitration Association in New York, New York in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The fees for arbitration shall be borne by the losing party unless otherwise awarded." [1]

---

[1] Preliminary Hearing Order, January 11, 2021 ("Procedural Order No. 1") ¶ 4(a).

6.     APIIG and HRIECO agreed that the Commercial Arbitration Rules of the American
Arbitration Association, as Amended and Effective October 1, 2013 (the "Rules"), are a part of
the Arbitration Agreement,[2] and that the International Centre for Dispute Resolution of the
American Arbitration Association would administer this arbitration. APIIG and HRIECO also
agreed the seat of the arbitration is New York, New York, USA, and the procedural law of the
arbitration is the Federal Arbitration Act, 9 U.S.C. §§ 1–16 and 201–208.[3]

7.     The substantive law governing the dispute in this arbitration is New York law, as
provided in the 2019 Supply Agreements:

> "Governing Law. This Supply Agreement and all matters arising out of or relating to this
> Supply Agreement are governed by, and construed in accordance with, the laws of the
> State of New York, USA, without giving effect to any conflict of laws provisions thereof
> that would result in the application of the laws of a different jurisdiction."[4]

8.     Sinosure objected to the Arbitrator's jurisdiction and moved to dismiss the arbitration as
to it, on the basis that it is not a party to the Arbitration Agreement, nor to the underlying
commercial agreements or transactions, never consented to arbitration, and none of the theories
under which nonsignatories may be ordered to arbitrate apply on the facts of this case. On May
7, 2021, the Arbitrator delivered Orders on the Motions with detailed reasons denying the
motion, which Orders and reasons are incorporated herein by reference. Sinosure has continued
to object to the Arbitrator's jurisdiction throughout this arbitration.

## III.     PROCEDURAL HISTORY OF THE ARBITRATION

9.     APIIG initiated the arbitration by demand for arbitration dated May 27, 2020 and a
Statement of Claim to which was annexed a copy of the arbitration agreement.

10.     The Arbitrator was appointed on December 14, 2020.

11.     A preliminary hearing was held by teleconference on January 11, 2021, after which
Procedural Order No. 1, incorporated herein by reference, issued dated January 11, 2021.

12.     In accordance with the schedule established in Procedural Order No. 1, HRIECO filed an
Answering Statement with Affirmative Defenses and Counterclaims against APIIG, dated
February 15, 2021.

13.     APIIG filed an Answering Statement to the Counterclaims, dated March 5, 2021.

---

[2] Procedural Order No. 1 § 4(b).
[3] Procedural Order No. 1 §§ 4(c)-(d).
[4] Procedural Order No. 1 § 4(e).

14.     Sinosure did not file an Answering Statement, and is deemed to have denied all of APIIG's claims pursuant to Rule R-5(a).

15.     HRIECO also filed a motion to dismiss the arbitration or, in the alternative, to dismiss APIIG's unjust enrichment claim, and Sinosure filed a motion to dismiss the arbitration as to it. APIIG opposed both motions.

16.     A motions hearing was held by videoconference on March 22, 2021.

17.     On May 7, 2021, the Arbitrator delivered Orders on the Motions with detailed reasons, which Orders and reasons are incorporated herein by reference, denying all motions. These Orders also reserved costs on the motions and confirmed that the merits hearing would commence on August 16, 2021, as previously set forth in Procedural Order No. 1.

18.     On July 8, 2021, the parties applied to adjourn the August 16 merits hearing for 90 days, on the basis that they had engaged a third party mediator to assist them in efforts to resolve the matter. As set forth in more detail in Procedural Order No. 2,[5] which is incorporated herein by reference, the Arbitrator adjourned the merits hearing from August 16 to October 12, 2021, and scheduled a status conference on September 14, 2021. During that September 14 status videoconference, the parties reported they remained in discussions and requested a further adjournment. The Arbitrator adjourned the status conference to October 12, 2021, and adjourned the merits hearing to November 16, 2021. During the October 12 status videoconference, the parties again reported they remained in discussions and requested a further adjournment. The Arbitrator adjourned the status conference to November 16, 2021.[6]

19.     During the status videoconference on November 16, 2021, the parties reported that their efforts to resolve the matter through third party mediation had been unsuccessful. APIIG and HRIECO discussed with the Arbitrator their need to develop and jointly propose a procedural timetable leading to a merits hearing in mid-2022. Their efforts to develop the procedural timetable, resulting in a joint submission on January 24, 2022, are described in more detail in Procedural Order No. 2.

20.     On January 31, 2022, the Arbitrator issued Procedural Order No. 2, which is incorporated herein by reference, accepting, finalizing, and annexing the parties' procedural timetable leading to a merits hearing commencing in June 2022. APIIG and HRIECO conducted document discovery following issuance of Procedural Order No. 2 and this procedural timetable. Neither APIIG nor HRIECO brought any discovery disputes to the Arbitrator for resolution.

---

[5] Procedural Order No. 2, dated January 31, 2022 ("Procedural Order No. 2").
[6] Ibid.

21.     Commencing in May 2022, APIIG and HRIECO filed Pre-Hearing Submissions and Reply Submissions comprising briefs, witness statements, exhibits, and authorities more generally as described in Procedural Order No. 2. Sinosure made no such submissions, continuing to object to the jurisdiction of the tribunal.

22.     As contemplated by Procedural Order No. 2, a Pre-hearing Conference was held on June 14, 2022, after which the Arbitrator issued Procedural Order No. 3,[7] which is incorporated herein by reference, confirming a schedule for the evidentiary hearing and post-hearing submissions.

23.     In accordance with Procedural Order No. 3, with the consent of the parties, the evidentiary hearing was conducted by videoconference on June 21, June 22, and July 19, 2022, after which APIIG and HRIECO filed post-hearing briefs on August 9, 2022, then delivered closing arguments by videoconference on August 16, 2022. Testimony on behalf of APIIG was presented by Sharif Omar, APIIG's President, through written witness statements and by videoconference on June 21, 2022, and by APIIG's expert witness James Kababick through written witness statements and by videoconference on July 19, 2022. Testimony on behalf of HRIECO was presented by Xia Li, HRIECO's Chief Executive Officer, through a witness statement adopted under oath during the hearing and by videoconference on June 22, 2022 during that hearing.

24.     Following closing arguments on August 16, 2022, APIIG and HRIECO indicated they wished to continue to explore settlement of the dispute. On September 7, 2022, the parties advised the Arbitrator that these renewed efforts to amicably settle the matter had been unsuccessful. Accordingly, the Arbitrator closed the hearing, pursuant to Rule R-39(b) of the Rules, on September 7, 2022. Thereafter, with the parties' consent, the hearing was reopened for the limited purpose of receiving applications for costs including attorneys' fees and replies, if any, to those submissions. APIIG and HRIECO submitted applications for attorneys fees and costs on, respectively, October 22 and October 21, 2022. APIIG submitted opposition to HRIECO's application on November 1, 2022. The parties agreed to extend the deadline for the final award to on or before November 14, 2022, agreed that the final award could be signed electronically, and agreed to further extend the deadline for the final award to December 9, 2022.

## IV.     FACTUAL BACKGROUND

### A.     APIIG

25.     APIIG purchases, imports, and resells ingredients for use in the manufacture of dietary supplements and other products. It resells these imported ingredients exclusively to an affiliated

---

[7] Procedural Order No. 3, June 14, 2022 ("Procedural Order No. 3").

company, Liptis Pharmaceuticals USA, Inc. ("Liptis USA").[8] APIIG has engaged in inter-affiliate transactions with Liptis USA since APIIG's inception.[9]

26.     Liptis USA, among other things, blends these imported ingredients purchased from APIIG with other goods to manufacture dietary supplements which it sells to third parties (Liptis Decl. ¶ 3). Liptis USA sells these finished goods to customers "in markets where [the] sales price is fixed by the government" (R-125, Dec. 5, 2018) ("we sell our finished goods in markets where our sales price is fixed by the government"), i.e. in markets outside the United States, where "our selling price is fixed" (C-5, Dec. 20, 2018). Liptis USA is not party to this arbitration,

27.     In addition, during 2018, 2019, and 2020, Liptis USA invoiced Liptis For Pharmaceuticals and Medical Products (S.A.E.) located in Giza, Egypt ("Liptis Egypt") for the ingredients Glucosamine and Ginkgo Biloba Extract, both of which are used in the manufacture of finished goods (R-34 through R-54).[10] Liptis Egypt is not party to this arbitration.

28.     The APIIG businesses were founded by the parents of brothers Sami Omar and Sharif Omar and, from at least 2012 until some time in the second half of 2017, Sami Omar handled APIIG's day-to-day business operations. Sharif Omar joined the company in 2012 as a business manager. At some point, the parents divorced, and the family business was affected, including through shifting alliances among family members.

29.     Sharif Omar took over the day-to-day operations of APIIG as of November 1, 2017. He is President of APIIG,[11] and President and Managing Director of Liptis USA (Liptis Decl. ¶ 1). His brother Sami Omar left APIIG during the second half of 2017, and eventually took over and operates Liptis Egypt. Their separation was not amicable.

30.     APIIG and Liptis USA are separate but affiliated entities operating their businesses from the same location. They have separate bank accounts and separate books and records. Sharif Omar testified that they have no written inter-affiliate agreements, but rather an unwritten agreement, the terms of which are known to him, president of both companies, which requires Liptis USA to pay APIIG a fee (Liptis Decl. ¶ 6) and which requires APIIG to pay Liptis USA for any losses incurred by Liptis USA in connection with the ingredients sold to it by APIIG.

---

[8] Oral Testimony of Sharif Omar, June 21, 2022 ("Sharif Omar Testimony").
[9] Declaration of Sharif Omar, May 4, 2022 ("Liptis Decl.") ¶ 2.
[10] HRIECO obtained copies of these invoices from Liptis Egypt for purposes of this proceeding.
[11] Declaration of Sharif Omar, May 3, 2022 ("APIIG Decl.") ¶ 1; Reply Declaration of Sharif Omar, May 27, 2022 ("APIIG Reply Decl." ¶ 1).

31.     Currently, Liptis USA and Liptis Egypt "are not commonly owned, controlled, or managed" (APIIG Reply Decl. ¶ 30). Currently, Liptis USA does not do business with Liptis Egypt. Currently, HRIECO does business with Liptis Egypt.[12]

32.     APIIG declined HRIECO's requests to produce documents about the corporate structure of its businesses or the financial and accounting transactions among its businesses, and did not produce documents reflecting: sales of Ginkgo Biloba Extract by it or Liptis USA; manufacture or attempted manufacture by Liptis USA of finished product using Ginkgo Biloba Extract; sales by Liptis USA of finished product containing Ginkgo Biloba Extract; communications about criteria for, and testing of Ginkgo Biloba Extract; any attempts to mitigate; or chargebacks to APIIG by Liptis USA. APIIG did not produce documents supporting its claims for damages including lost profits (R-144).

### B.     HRIECO

33.     HRIECO is a business that sources, purchases, and resells ingredients manufactured in China to customers such as APIIG. In particular, HRIECO sells ingredients for dietary supplements, among other ingredients including human and animal pharmaceutical ingredients. HRIECO does not manufacture nor does it take physical possession of any of these ingredients. Rather, HRIECO assists its customers in identifying ingredient manufacturers in China, contracts with these manufacturers, contracts with its customers, and arranges for the shipment of the purchased ingredients from contracted manufacturers in China to designated warehouses in China, e.g. the Port of Shanghai, for shipment directly to customers such as APIIG. Xia Li is Chief Executive Officer of HRIECO.

### C.     Ginkgo Biloba Extract

34.     Ginkgo Biloba Extract is an ingredient in dietary supplements that is defined by the United States Pharmacopeia Convention (the "USPC") as follows:

> Powdered Ginkgo Extract is prepared from dried and comminuted leaves of Ginkgo extracted with an acetone–water mixture or other suitable solvents. The ratio of the crude plant material to Powdered Extract is between 35:1and 67:1. It contains NLT 22.0% and NMT 27.0% of flavonoids, calculated as flavonol glycosides, with a mean molecular mass of 756.7, on the dried basis. It contains NLT 5.4% and NMT 12.0% of terpene lactones, consisting of between 2.6% and 5.8% of bilobalide ($C_{15}H_{18}O_8$) and between 2.8% and 6.2% of the sum of ginkgolide A ($C_{20}H_{24}O_9$), ginkgolide B ($C_{20}H_{24}O_{10}$), and ginkgolide C ($C_{20}H_{24}O_{11}$), on the dried basis. (USP 35 Definition, USP 41 Definition).

---

[12] Sharif Omar Testimony; Oral Testimony of Xia Li, June 22, 2022 ("Xia Li Testimony").

35.     The USPC has published in its official compendium testing methodologies and acceptance criteria according to which it may be determined whether or not any particular manufacturing batch or sample of product to be sold as Ginkgo Biloba Extract meets the USPC definition of Ginkgo Biloba Extract. These USPC testing methodologies and acceptance criteria have evolved over the years and are in continuous revision (R-145). Thus, the USPC monograph USP 35, official from May 1, 2012 (R-145), was updated or revised in later monographs, relevantly, including in a First Supplement to USP 35, official from August 1, 2012 (R-8); USP 36 (R-32); USP 37 Second Supplement (2014)(R-98, "Acceptance criteria: NMT 4% of rutin and NMT 0.5% of quercetin"); USP 40, official from May 1, 2017 (R-145; R-33); and USP 41, official from May 1, 2020.[13]

36.     The United States Food and Drug Administration (US FDA) regulates dietary supplements sold in the United States and an importer or manufacturer must demonstrate that the ingredients to be used in manufacturing a dietary supplement meet identity, purity, strength, and composition specifications before that ingredient may be included in finished product (APIIG Decl. ¶¶ 34-37; see also Kababick Reply Decl. ¶ 30 and Ex. N Dietary Supplement Health and Education Act of 1994). Among other things, a dietary supplement is considered "misbranded" and may not be sold in the United States if the supplement is covered by the specifications of an official compendium, is represented as conforming to the specifications of the official compendium, and fails to so conform (Kababick Reply Decl. Ex. N). Nor would the product be lawful to sell as a dietary supplement on the United States market if an ingredient in it had been chemically altered, for example, through additional processing steps in the manufacture of Ginkgo Biloba Extract ingredient leading to the elevation of quercetin above the limit specified in current USP or involving the introduction of exogenous quercetin, unless a 75-day premarketing notification of a new dietary ingredient had been filed with US FDA and US FDA had not objected (Kababick Reply Decl. ¶¶ 30-31).

37.     In May 2018, the Center for Science in the Public Interest urged United States consumers to avoid supplements containing Ginkgo Biloba Extract and called on the US FDA to exercise its enforcement powers to seize adulterated product (APIIG Decl. ¶ 31). The US FDA performs random spot sampling at US ports of importation in order to determine whether or not products under its jurisdiction comply with applicable laws and regulations and may be imported into the United States (APIIG Decl. ¶ 32).

38.     Some suppliers that export products to the United States register with the US FDA "to permit admission with compliance shown by voluntary third-party verification testing, which is what was done here" (APIIG Decl. ¶ 32 and note 4).

---

[13] R-145 and Reply Declaration of James Kababick, May 26, 2022 ("Kababick Reply Decl.") ¶ 21 and Ex. K. Mr. Kababick testified as an expert appointed by APIIG. He is the Director of Flora Research Laboratories, LLC ("Flora Labs"), located in Oregon, USA (Declaration of James Kababick, May 4, 2022 ("Kababick Decl.") ¶¶ 1, 4).

39.    Zhejiang Golden-Shell Pharmaceutical Co., Ltd. ("Golden-Shell") holds FDA
Registration Number 10892543018 (e.g. R-62; APIIG Decl. ¶ 32 and note 4). Zhejiang Shaoxing
Dongling Health Food Co., Ltd. ("Dongling") does not hold an FDA Registration. According to
APIIG, Beijing Refine Biology Co., Ltd. ("Beijing Refine") holds FDA Registration Number
14585147874 (APIIG Decl. ¶ 43). HRIECO holds FDA Registration Number 11529498370
(e.g., R-62). APIIG holds Registration Number 13644957472 (e.g., R-10).

### D.    APIIG and HRIECO: Manufacturers

40.    During 2012, in response to a request from Sami Omar, then responsible for APIIG's
day-to-day business operations, Xia Li of HRIECO assisted APIIG in identifying a manufacturer
of Ginkgo Biloba Extract, Dongling, and a manufacturer of Glucosamine Sulfate Potassium
("Glucosamine"), Golden-Shell. HRIECO provided APIIG with certificates of analysis and
samples from these manufacturers, and APIIG's business commenced with Dongling and
Golden-Shell (Xia Li Testimony).

41.    In 2014, Xia Li of HRIECO accompanied Sami Omar of APIIG on due diligence visits to
the Dongling and Golden-Shell factories. She was present when Sami Omar talked with
representatives of those factories about their manufacturing processes and quality controls,
including their Pharmacopeia standard capabilities and pesticide controls (Xia Li Testimony).

42.    APIIG "is duty bound to police what it offers for sale or manufacture and to label its
goods properly and accurately (APIIG Decl. ¶ 38).

43.    Following these 2014 factory visits, APIIG continued to purchase ingredients
manufactured by Dongling and Golden-Shell, demonstrating satisfaction with the manufacturing
processes and quality controls that it determined were in place at Dongling and Golden-Shell.

44.    Dongling represented as recently as March 11, 2020, that Dongling's manufacturing site,
manufacturing processes, and the specifications of Ginkgo Biloba Extract produced by Dongling
had not changed since 2015 (Statement of Dongling, R-23 last page).

45.    HRIECO was APIIG's exclusive supplier of Ginkgo Biloba Extract (Testimony of Sharif
Omar). APIIG resold that Ginkgo Biloba Extract exclusively to Liptis USA (Ibid.). The Ginkgo
Biloba Extract HRIECO supplied to APIIG was manufactured by Dongling.

46.    According to APIIG, throughout the entire period of their relationship, HRIECO
"fulfilled its contractual obligations, as did [APIIG] until [HRIECO] breached its contract with
[APIIG during 2019]" (APIIG Reply Decl. ¶ 31).

47.     According to APIIG, "At this point, [APIIG's] only effective way to engage with a new supplier in China would be to visit their site, but with Covid-19 restrictions into and out of China, this option is effectively foreclosed." (APIIG Decl. ¶ 58).

### E.     APIIG and HRIECO: 2017

#### 1.     US FDA Registration

48.     Golden-Shell is among the overseas manufacturers that register with the US FDA to facilitate importation of US FDA-regulated product into the United States, i.e., "to permit admission with compliance shown by voluntary third-party verification testing" (see ¶ 38 above**).**

49.     Any regulated product shipped to the United States is subject to inspection by US FDA, but the risk of inspection is less for product shipped by foreign manufacturers who have registered with US FDA (Sharif Omar Testimony).

50.     During 2017, Golden-Shell's US FDA registration (then Number 11238964626) lapsed or failed to renew, leading to rejection by US FDA, delay upon a shipment's arrival in New York, and inconvenience to APIIG and HRIECO (R-85, R-116), illustrating to both APIIG and HRIECO the importance of an exporter's valid US FDA registration to the efficient and successful importation of ingredients regulated by US FDA.

51.     US FDA had rejected the shipment[14] upon arrival in late February 2017, because: "Rejected – Data Rejected Per Review" and "Manufacturer Registration Invalidated" (R-85).

52.     APIIG's import broker confirmed with US FDA that Golden-Shell's Registration was invalid and advised APIIG that Golden-Shell would need to apply for a new registration (R-85). Sami Omar of APIIG wrote to HRIECO, asking whether, despite these communications, Golden-Shell would be able to prove it had a valid registration:

> It would be very helpful if Goldenshell can screen print from the FDAs website showing their registration number and showing it is valid (R-85, Mar. 1, 2017).

53.     Golden-Shell learned that its registration had lapsed, failed to renew, or had otherwise been invalidated, and that it would need to reapply to US FDA for registration (R-85 and R-116).

54.     APIIG and its import broker explored other processes through which to import the product held at the port and, on March 3, 2017, Xia Li of HRIECO wrote to Sami Omar of

---

[14] The shipment is described by APIIG's import broker in the heading of its e-mail to APIIG as "12,000kg of Glucosamine, 1,300kg Ginkgo," suggesting that Golden-Shell, the manufacturer of Glucosamine, may have been listed as the manufacturer of both Glucosamine and Ginkgo Biloba Extract.

APIIG: "Is it ok for FDA problem?" (R-116). He responded that the goods had been released for this particular shipment but that the problem would need to be addressed for future shipments:

> For this shipment, the goods are clear but this problem will happen again with the next shipment. I will discuss with you next week (R-116).

55.     Ultimately, Golden-Shell applied for, obtained, and proceeded to use a new US FDA Registration number, 10892543018 (e.g. R-62).[15]

## 2.     Purchase Orders

56.     On May 10, 2017, Sami Omar of APIIG placed three Purchase Orders with HRIECO, each for 12,000 kilograms of Glucosamine manufactured by Golden-Shell and 1,200 kilograms of Ginkgo Biloba Extract manufactured by Dongling, for shipment from China to New York on, respectively, July 17, September 18, and October 30, 2017 (C-3).

## 3.     USP Acceptance Criteria

57.     During 2012, when business commenced with Dongling (¶ 40 above), the official USPC monograph for Ginkgo Biloba Extract was USP 35 (Official from May 1, 2012, R-145).

58.     In June 2017, soon after APIIG placed the three May 10, 2017 orders, APIIG and HRIECO became aware that the USPC previously had published an update to its monograph for Ginkgo Biloba Extract, in a Second Supplement to USP 37, which stated acceptable limits of the flavonoids rutin and quercetin:

> "Acceptance criteria: NMT 4% of rutin and NMT 0.5% of quercetin" (R-98).[16]

59.     HRIECO's Xia Li and Sami Omar of APIIG discussed this criteria when Dongling and HRIECO were preparing to fulfill the first of the three May 10, 2017 Purchase Orders, scheduled to depart China in mid-July 2017. Xia Li wrote to Sami Omar:

> Refer to USP grade of ginkgo biloba, pls email us the new one ASAP so that we can check immediately before our July shipment (R-98, June 27, 2017).

60.     A few days later, Xia Li reminded APIIG that Dongling was waiting to receive the USP monograph under discussion:

---

[15] Golden-Shell is the Shipper on the Bills of Lading for the Glucosamine and Ginkgo Biloba Extract that was shipped from Shanghai to New York for importation by APIIG during 2019.

[16] At this point, in June 2017, USPC had already issued USP-40, official from May 1, 2017 (R-145), which contained the same acceptance criteria as that highlighted by APIIG in the USP-37 Second Supplement.

Ginkgo factory is still waiting for your new USP regulation. Pls also advise. (R-117, July 3, 2017).

61.    Sami Omar responded, attaching the USP 37 (Second Supplement):

Attached is the USP reference for Ginkgo. The acceptance criteria i was referring to is highlighted in yellow on page 3 [which yellow-highlighted portion reads:]

Acceptance criteria: NMT 4% of rutin and NMT 0.5% of quercetin.
(R-98; and R-98, page 3, July 5, 2017).

62.    HRIECO discussed this acceptance criteria with Dongling, and learned that Dongling would not be able to produce Ginkgo Biloba Extract in compliance with this USP 37 acceptance criteria (R-118). Xia Li then discussed this USP 37 acceptance criteria with other Ginkgo Biloba Extract factories in China, and learned that none of them would be able to produce Ginkgo Biloba Extract in accordance with the USP 37 acceptance criteria (R-118).

63.    Xia Li of HRIECO then advised Sami Omar of APIIG that neither Dongling nor other producers would be able to supply Ginkgo Biloba Extract in accordance with the USP 37 acceptance criteria, and asked whether APIIG still wanted to go ahead with the July shipment:

We checked USP new pharmacopoeia with other ginkgo factories, but all failed. They cannot supply conformed material with same reason as Dongling. So pls advise if you still want to go on the July shipment (R-118, July 13, 2017).

64.    APIIG decided to proceed with Ginkgo Biloba Extract produced to USP 35 standard which, unlike USP 37 (Second Supplement), does not limit quercetin to NMT (not more than) 0.05%. Sami Omar of APIIG responded:

Yes, you may proceed with July shipment (R-118).

**F.    APIIG and HRIECO: 2018**

**1.    2018 Supply Agreements**

65.    Against this background, on or about February 2, 2018, APIIG and HRIECO entered into four Supply Agreements (C-2) ("2018 Supply Agreements") for shipment, respectively, in mid-June, end of August, end of September, and end of October 2018, each for 12000 KG of Glucosamine USP 39 manufactured by Golden-Shell, and 1300 KG of Ginkgo Biloba Extract USP 35 manufactured by Dongling:

D-GLUCOSAMINE SULFATE POTASSIUM USP 39
EX: ZHEJIANG GOLDEN-SHELL PHARMACEUTICAL CO., LTD

GINKGO BILOBA EXTRACT USP 35 (1 X 20 GP)
EX: ZHEJIANG SHAOXING DONGLING HEALTH FOOD CO., LTD.

66.    Each of APIIG's Purchase Order placed against these four 2018 Supply Agreements ordered 1300 kg of Ginkgo Biloba Extract manufactured by Dongling (C-4), for a total of 5,200 kg of Ginkgo Biloba Extract ordered under the 2018 Supply Agreements.

## 2.    APIIG: Liptis USA Product Development

67.    During 2018, J Avalos of APIIG asked Xia Li of HRIECO to supply Drug Master Files[17] for the manufacture of Glucosamine and the manufacture of Ginkgo Biloba Extract:

> Please provide us with the Drug Master Files for both, Glucosamine and Ginkgo Biloba. Your prompt reply is greatly appreciated (R-72, Feb. 2, 2018).

68.    HRIECO provided APIIG with Golden-Shell's DMF Number for Glucosamine and some related documentation, and advised APIIG there was no DMF for Ginkgo Biloba Extract:

> Ginkgo Biloba.--There is no factory with DMF files in China .Pls noted .

69.    APIIG again requested Golden-Shell's DMF for the manufacture of Glucosamine, approximately three months later (R-72, Apr. 26, 2018). HRIECO responded that Golden-Shell's DMF, as such, could not be sent because it constituted or contained manufacturing know-how, but that portions possibly might be provided. APIIG then provided HRIECO with a list of requested documents (R-90).

70.    In December 2018, Sharif Omar of APIIG advised Xia Li that APIIG was working on the development of new products (C-5).

## 3.    USP Acceptance Criteria

71.    On October 8, 2018, J Avalos of APIIG asked HRIECO whether Dongling's Certificate of Analysis ("COA") for Ginkgo Biloba Extract could indicate the higher USP 40 Grade rather than the USP 35 Grade specified in the 2018 Supply Agreements and on Dongling's COA:

---

[17] A Drug Master File (DMF) is a submission to US FDA used to provide confidential, detailed information about facilities, processes, or articles used, for example, in the manufacturing or processing of a drug product. This allows the DMF holder to allow another person to reference the confidential material in the DMF to support its own submission to US FDA without the need for the DMF holder to disclose the confidential DMF contents to that other applicant.

We noticed that the COA for Ginkgo indicate "Ginkgo Biloba Extract USP 35" under product name, can USP 40 be indicated instead of USP 35? (R-91, R-135).

72.     HRIECO promptly responded that Dongling could achieve USP 35, but not USP 40, and that Dongling's COA accurately certified compliance with USP 35 but could not certify compliance with USP 40:

Since USP40 has more strict requirement for pesticide control. While chinese factory cannot reach. Factory can reach USP35. Pls kindly understand (R-137).

73.     HRIECO supplemented that response with a fuller explanation from Dongling, the manufacturer, dated October 9, 2018:

Pls find attached explanation letter from Ginkgo factory.
Hope it can help you to understand the difference of USP35 and USP41
(R-135, Oct. 9, 2018).

74.     In that attached explanation letter, *The difference of Ginkog [sic] Biloba Extract in USP <35> and USP <41> Grade*, R-135, Dongling explained it would not be able to manufacture to the then current USP standard, because that USP standard required quercetin content to be less than 0.05%, a standard impossible for Dongling to meet. Dongling explained that because it must remove pesticide residue from the material to satisfy APIIG requirements, Dongling must process the material again, and this additional processing would raise the quercetin content above 0.05%. Therefore:

That's why we suggest you to accept the USP35 grade in order to control the pesticide residue can meet your requirement (R-135).

### 4.     Invoices from Liptis USA to Liptis Egypt

75.     The USP 40 monograph was in effect from May 1, 2017 (R-145; R-33) and the USP 41 monograph was in effect from May 1, 2020 (¶ 35 above). During 2018, 2019, and 2020, Liptis USA invoiced Liptis Egypt for Glucosamine and Ginkgo Biloba Extract, including 7,560 kilograms of Ginkgo Biloba Extract described as having been manufactured during 2018 and more particularly as follows:

25 kg of USP 37 manufactured in September 2018 (R-34, Nov. 30, 2018)
25 kg of  USP 40 manufactured in July 2018 (R-35, Dec. 21, 2018)
1000 kg of USP 37 manufactured in November 2018 (R-37, Jan. 11, 2019)
25 kg of USP 40 manufactured in July 2018 (R-36, Jan. 25, 2019)
25 kg of USP 40 manufactured in July 2018 (R-38, Feb. 15, 2019)

       1000 kg of USP 37 manufactured in December 2018 (R-40, Feb. 26, 2019)
       25 kg of USP 40 manufactured in July 2018 (R-39, Mar. 11, 2019)
       50 kg of USP 40 manufactured in July 2018 (R-41, Apr. 15, 2019)
       60 kg of USP 40 manufactured in July 2018 (R-42, Apr. 15, 2019)
       1000 kg of USP 37 manufactured in July 2018 (R-43, May 1, 2019)
       1000 kg of USP 37 manufactured in August 2018 (R-44, June 28, 2019)
       375 kg of USP 40 manufactured in July 2018 (R-54, Feb. 20, 2020)

78.    In July 2019, Liptis USA also invoiced Liptis Egypt for Ginkgo Biloba Extract described as 1000 kg of USP 37 having a manufacturing date "To Be Determined"(R-45, July 23, 2019).

## V.    CONTRACTS AND PERFORMANCE

### A.    2019 Supply Agreements: Contract Formation

#### 1.    Product, Price and Quantity Terms

79.    In early December 2018, Xia Li of HRIECO opened negotiations with APIIG for 2019, offering annual quantity and price terms for Glucosamine and Ginkgo Biloba Extract (R-125):

> Good news for you! . . .
>
> Considering our long and stable relationship with Leptis and API for more than 10 years, we really want to thank you in real action.
> So we united all our golden suppliers to support you for premium quality order products, just hope you can lower down the cost and
> deveolop your market. The following is annual price for 2019.
>
> Glucosamine sulphate potassium 60mt min: USD9.3/KG CIF SEA NY.
>
> Ginkgo biloba extract 6mt min: USD105.5/KG CIF SEA NY.
> All others are same as previous (R-125, Dec. 3, 2018).

80.    Sharif Omar of APIIG requested HRIECO's best prices for 2019 in response, and asked how lower prices might be applied as credits to remaining 2018 shipments and unpaid invoices:

> As I have explained earlier, we sell our finished goods in markets where our sales price is fixed by the government and we have no way of passing on any cost increases to the markets. That is why senior management insisted that we obtain competitive offers from our suppliers.

We have received other offers, some of which are lower for Glucosamine and significantly lower for Ginkgo.

In consideration of our long standing stable relationship and my desire to continue our business together, I want to put together a proposal to senior management for approval.

Therefore, please revise your offer to provide your best price and indicate how these lower prices will be applied as credits to the remaining shipments and unpaid invoices.

I can then have what I need to make the argument to try and convince them to keep the business with you (R-125, Dec. 5, 2018).

81.     Xia Li discussed APIIG's position with Dongling and Golden-Shell, reported their negative reaction to Sharif Omar and, following the calls with both manufacturers, personally traveled from Anhui Province to Zhejiang Province to meet and continue discussions with the two manufacturers (R-68, Dec. 13, 2018):

After yesterday's call with both factories, it is really difficult to persuade factories to settle shipped container as you like. Because all of them
think contract is contract with legal force. They said if cost of product rise, can they ask you to rise after contract signed?
It is obviously impossible to negotiate like this.

While standing on your esteemed company and longterm cooperation, this morning, I decided to visit factories personally. Now I already arrived factory location and will have further discussion tomorrow. Hopefully I can change their mind a little. I will update you information ASAP before next Monday.

82.     Sharif Omar promptly responded, asking Xia Li to focus on 2019 pricing:

Please then focus on the pricing for 2019. Thank you for your efforts and we look forward to good news on Monday (R-68).

83.     Xia Li continued discussions with Golden-Shell and Dongling and, on December 16, 2018, wrote to Sharif Omar of APIIG to advise him that the two manufacturers had agreed to support the discounted price for 2019, and to discount the price for the last of the 2018 shipments (R-69 and C-5, e-mail "final offer for annual order 2009):

After negotiation with two factories, we finally can support you more discount price for annual order 2019.
glucosamine sulfate 60-70mt: $9.2/kg
ginkgo biloba 2-7mt:$105.3/kg

Refer to shipment by end Dec, I also finally persuaded factory to give you discount price for this special container:
GLucosamine 12000kg by Dec: USD9.6/KG
Ginkgo 1300kg by Dec shipment: USD112/KG

The total discount amount USD21500.00 will be deducted from 1st order invoice payment in 2019.
**Both big bosses of factory appreciate long-term cooperation and your support.** So all of us really want to show our sincerity to keep business with API.
To be frank, the price trend of raw material is in increase, because all environmental control, lable cost will be probably up again.
Next year's exchange rate is also chalenging for us. So factory can keep us offer till next Wednesday because it is really bottom now.
Hope you can confirm by return ASAP (R-69, emphasis added).

84. Sharif Omar promptly acknowledged the revised offer:

Thank you for this revised offer. We have a meeting tomorrow to discuss and I hope to reply with good news (R-69, Dec. 17, 2018).

85. Sharif Omar then advised Xia Li (C-5, Dec. 19, 2018, emphasis added):

I have good news; we received approval for the following 2019 orders, for Glucosamine and Ginkgo **with the same specifications as the goods currently being provided**.

| Ship Date | Glucosamine (kg) | Ginkgo (kg) |
|-----------|------------------|-------------|
| 15-Feb-19 | 13,000 | 300 |
| 15-Apr-19 | 13,000 | 300 |
| 15-Jun-19 | 13,000 | 300 |
| 15-Aug-19 | 13,000 | 300 |
| 15-Oct-19 | 13,000 | 300 |
| 15-Dec-19 | 13,000 | 300 |
| Total | 78,000 | 1,800 |

86. When Xia Li asked why APIIG wanted to purchase only 1800 kilograms of Ginkgo Biloba Extract for 2019, less than what it had ordered in the past, Sharif Omar responded:

As mentioned before, all costs keep rising and our selling price is fixed. Since Ginkgo is the most costly ingredient, we had to reduce the quantity used.

We are working on development of new products and we will send you a list of potential ingredients that we will need for these projects (C-5, Dec. 20, 2018).

### 2. The HRIECO-Dongling Agreement

87.     HRIECO and APIIG having agreed product specifications, quantity and price for 2009, on or about December 21, 2018, HRIECO and Dongling entered into a Purchase Agreement (the HRIECO-Dongling Agreement) pursuant to which Dongling would manufacture and supply USP 35 Grade Ginkgo Biloba Extract to HRIECO, in six separate shipments, each 300 kilograms packed in cardboard barrels with a net weight of 25 kilograms for export, for delivery to a warehouse in Shanghai by the ends of, respectively, January 2019, March 2019, May 2019, July 2019, September 2019, and November 2019 (R-24, HRIECO translation[18]).

88.     The HRIECO-Dongling Agreement provided with respect to product quality and testing that it would, inter alia, strictly comply with USP 35 export requirements and USP 561 residue pesticide requirements, and would produce ingredient in which total flavone glycosides would be greater than or equal to 24% and total terpene lactones would be greater than or equal to 6%:

> **Commodity Quality Standards**: Strict compliance with USP35 export requirements and USP561 pesticide residue specifications. Ginkgo acid＜lppm, Q:K/0.8-1.65. Total flavone Glycosides>=24.00%, Total terpene lactones>=6.00%.Fresh goods within two months, goods must not contain any foreign material, such as black spots, insects, hair, etc. The test report sheet should show the microbial indicators and specific test values, not "qualified" and other words (R-24 HRIECO translation).

### 3. Drafts Exchanged

89.     On the same date, HRIECO sent six one-page draft agreements to APIIG (R-124; R-126, Dec. 21, 2018). These drafts contained the quantity, price, product specification, and ship date terms agreed with APIIG and, relevantly, with regard to the specifications for Ginkgo Biloba Extract to be manufactured by Dongling, provided, as in the 2018 Supply Agreements, the ingredient would be manufactured to USP 35 standard, total flavone glycosides would be greater than or equal to 24% and total terpene lactones would be greater than or equal to 6%  (R-124):

> GINKGO BILOBA EXTRACT 24%/6%  USP 35
> HIGH GRADE (NORMAL PARTICLE SIZE)
> EX: ZHEJIANG SHAOXING DONGLING HEALTH FOOD CO., LTD.
> (1 x 20 GP)

90.     In this draft, on the bottom half of the one-page supply agreement, HRIECO then proposed terms, modeled on those contained in the existing 2018 supply agreements (R-124; compare C-2).

---

[18] There were no objections to HRIECO's translation.

91.     Sharif Omar responded that the draft agreements were unacceptable:

> We have not signed such a contract before and our legal department will not agree to these conditions. We should continue our business as before as this will cause an unnecessary obstacle. (C-5; R-126, Dec. 24, 2018).

92.     Xia Li of HRIECO expressed surprise, as the drafts had been based either on the quantity, price, and product specification terms already agreed for 2019 or on terms contained in the bottom half of the one-page existing 2018 Supply Agreements:

> Sorry, we do not understand your meaning.
> Before, we signed annual SC [Supply Contract] between us and API [APIIG] every year to fix the whole year price. Otherwise we cannot fix whole year price without contract. (R-71)

93.     Sharif Omar responded, confirmed the annual order (quantity, price, and product specification terms) and offered to redline the terms with which he disagreed:

> The terms listed in the document you sent are not acceptable to us. We can agree to the annual order but not at the terms listed. If you send the document in a Word format, we will revise to terms we can accept and send back (R-71).

94.     Xia Li promptly sent him the draft in Word format as requested, and Sharif Omar responded (R-70, Dec. 28, 2018), with a redline against the draft sent by Xia Li (R-70):

> Attached is the revised agreement with the changes made and a redline showing which points were changed. Please confirm so we can sign and proceed.

95.     In the redline, Sharif Omar made certain formal or clarifying changes, e.g. proposing to move the product specifications from the main body of the agreement to an annexed schedule, clarifying insurance terms, shipment dates, and adding the definition "Port of Destination" to New York. APIIG then proposed more substantive changes to terms in the lower half of the one-page agreement, i.e. addressing who bears the risk of any downward price adjustment imposed by the Chinese government (HRIECO); revising existing sections on Discrepancy and Claim, Force Majeure, and Dispute Resolution; Arbitration, and adding new sections on Title to Goods; Risk of Loss, and Governing Law (R-70 Redline, Dec. 28, 2018).

96.     On January 2, 2019, Xia Li returned an updated draft, stating

> pls check if attached revised agreement is ok. If ok, we will revise all agreements and send you for sign back (R-123).

97.     Sharif Omar responded that the language of Xia Li's revised draft agreement was fine, but asked Xia Li to replace the name of the manufacturer, Dongling, which did not have a US FDA Registration Number, with the name "Beijing Refine Biology Co., Ltd.," which did have a US FDA Registration Number, and to add US FDA Registration Numbers to the draft:

> The language in the agreements is fine. However, please correct the name of the Ginkgo manufacturer to be "Beijing Refine Biology Co., Ltd." And also include the FDA Registration Number for both manufacturers (C-5; R-123, Jan 2, 2019).[19]

98.     Xia Li promptly responded that Dongling is the real manufacturer of Ginkgo Biloba Extract and stated her understanding that Sharif Omar wanted her to use the name and FDA Registration Number of Beijing Refine[20] (R-123, Jan. 2, 2019):

> But the real manufacturer of Ginkgo is Ex: Dongling. COA and goods are from Dongling.

> Only use FDA number of Beijing Refine. Pls kindly confirm by return you accept such arrangements for all orders (R-123).[21]

99.     Xia Li updated the draft as APIIG had requested, and returned the updated draft of the six contracts to Sharif Omar, having (i) added the Golden-Shell Registration Number, (ii) replaced the name Dongling with Beijing Refine, and (iii) added the Beijing Refine Registration Number:

> If everything is ok, pls find attached six agreements and sign back
> (C-6; R-115, Jan. 3, 2019)).

100.    Sharif Omar of APIIG responded:

> Our purchasing department is asking that you please add the additional details that are listed on your invoice; including Supplier FDA Registration No., Seller's DUNS NO., Glucosamine and Ginkgo HS numbers (R-115, Jan. 4, 2019).

---

[19] This January 2, 2019 reference to Beijing Refine is the first chronological reference to Beijing Refine in the documents of record in this arbitration.

[20] HRIECO has explained in this proceeding that Dongling "cooperates with [Beijing Refine] . . . in some business for U.S. market" (HRIECO Answer to APIIG Statement of Claim ¶ 28).

[21] It is disappointing that APIIG did not include Xia Li's response to Sharif Omar's request in the email chain submitted by APIIG (C-5). Her response was, however, included in the email chain submitted by HRIECO (R-123).

### 4.      2019 Supply Agreements: Execution and Terms

101.    On January 7, 2019, HRIECO executed and sent APIIG the final versions of the 2019 Supply Agreements:

>   Pls find attached revised SC. The global HS code is same with starting 6 digitals. So we only  mentioned 6 digitals HS code in SC in order to avoid
>   any misunderstanding.
>
>   Pls kindly sign back our SC immediately. Thank you (R-114, Jan. 7, 2019).

102.    Xia Li also sent a reminder email:

>   Pls sign back SC ASAP so that we can arrange everything.
>   Because our early Feb is chinese new year holiday. So Feb order will be ahead or delayed till end Feb/early March,2019.
>   Pls kindly confirm ahead or delayed. Thank you very much (R-114, Jan. 8, 2019).

103.    On January 9, 2019, Sharif Omar of APIIG returned the fully executed agreements, each dated January 2, 2019 (R-114, Jan. 9, 2019).

104.     HRIECO and APIIG thus executed the six 2019 Supply Agreements, the terms of which were identical, except for time of shipment, under each of which HRIECO agreed to sell, and APIIG agreed to buy, specified quantities of specified ingredients for specified prices (C-1).

105.    Under each of the 2019 Supply Agreements, APIIG agreed to pay $151,190, the sum of $119,600 for 13,000 kg of Glucosamine plus $31,590 for 300 kg of Ginkgo Biloba Extract. Thus, under the six 2019 Supply Agreements, APIIG agreed to pay $907,140, the sum of $717,600 for 78,000 kgs of Glucosamine plus $189,540 for 1,800 kgs of Ginkgo Biloba Extract.

106.    Glucosamine was specified in each of the 2019 Supply Agreements as follows:

>   D-GLUCOSAMINE SULFATE 2KCL  USP39
>   EX: ZHEJIANG GOLDEN-SHELL
>   PHARMACEUTICAL CO., LTD.
>   FDA REGISTRATION NO.:10892543018
>   HS CODE:2932.99

107.    Ginkgo Biloba Extract was specified in each of the 2019 Supply Agreements as follows:

GINKGO BILOBA EXTRACT 24%/6% USP35
HIGH GRADE (NORMALPARTICLE SIZE)
EX:BEIJING REFINE BIOLOGY CO., LTD.
FDA REGISTRATION NO:14585147874
HS CODE :2932.99
(1 X 20GP)

### B.    2019 Supply Agreements: Performance

108.    Having executed the 2019 Supply Agreements, APIIG placed six purchase orders with
HRIECO during January 2019, each corresponding to one of the 2019 Supply Agreements,
specifying ship departure dates and other terms including quantities, price, and payment terms.

109.    On January 11, 2019, APIIG placed the first of these purchase orders, JA 190111 (C-7).
APIIG referenced Dongling as manufacturer of Ginkgo Biloba Extract in this Purchase Order,
not Beijing Refine:

> Ginkgo Biloba Extract 24%/6%, USP
> High Grade (normal particle size)
> Supplier: Zhejiang Shaoxing Dongling Health Food Co., Ltd.
> HTS# 1302.19.4040 (C-7)

110.    On January 16, 2019, APIIG placed the remaining five purchase orders, JA 190116 (C-
10), JA 190116A (C-13), JA 190116B (C-20), JA 190116C (C-27), and JA 190116D (C-30).
None named Beijing Refine. None named Dongling, the manufacturer of Ginkgo Biloba Extract.
Instead, they named Golden-Shell, the manufacturer of Glucosamine, as the manufacturer of
Ginkgo Biloba Extract. Each of these orders specified with regard to Ginkgo Biloba Extract:

> Ginkgo Biloba Extract 24%/6%, USP
> High Grade (normal particle size)
> Supplier: Zhejiang Golden-Shell Pharmaceutical Co., Ltd.
> HTS# 1302.19.4040 (C-10)

### 1.    The First Shipment

111.    Having executed its agreement with HRIECO on December 21, 2018 (R-24), on
December 28, 2018, Dongling manufactured batch 201812019 of Ginkgo Biloba Extract USP
35, and tested that batch for compliance with USP 35 criteria using HPLC testing methodology
(R-145; R-9; R-138). Dongling determined that the batch met USP 35 criteria, that total flavone
glycosides were greater than or equal to 24%, and that total terpene lactones were greater than or
equal to 6%; issued a Certificate of Analysis certifying compliance with the contractually

required USP 35 and 24/6 standards (R-9; R-138),[22] and released that batch for shipment to APIIG. Golden-Shell manufactured and tested a batch of Glucosamine, determined that it met the agreed criteria, issued a Certificate of Analysis certifying compliance, and released that batch for shipment to APIIG. HRIECO provided each of these Certificates of Analysis, together with the Statements from Beijing Refine, and the commercial documents including the bill of lading, to APIIG (R-138).

112.    On February 18, 2019, HRIECO issued an invoice to APIIG, specifying payment due 90 days from Bill of Lading as provided in the 2019 Supply Agreement (C-9, R-138). This invoice provided the HRIECO DUNS number and its FDA Registration number 11529498370. It also described Golden-Shell with FDA Registration Number 10892543018 as "Manufacturer Facility Name" for Glucosamine, and Beijing Refine with FDA Registration Number 14585147874 as "Manufacturer Facility Name" for Ginkgo Biloba Extract (R-138).[23] HRIECO also supplied a Packing List, which referenced the Invoice, and listed 520 packages of Glucosamine Sulfate and 12 Barrels of Ginkgo Biloba Extract, having a total gross weight of 14116 KGS, measuring 30 CBM (R-138).[24]

113.    On February 23, 2019, at the Port of Shanghai, Golden-Shell, described on the carrier's Bill of Lading as Shipper / Exporter, delivered or caused to be delivered to the carrier 532 packages of Ginkgo Biloba Extract and D-Glucosamine Sulfate 2KCL, listed as "Shipper's Load, Count & Seal," having a gross weight of 14116 KGS and measuring 30 CBM, which were received and loaded on board the carrier on February 23, 2019 (C-8, R-25, R-138). The Bill of Lading does not name Dongling or Beijing Refine.

---

[22] An undated Certificate of Analysis on Beijing Refine letterhead otherwise substantially identical to that issued by Dongling for the batch of Ginkgo Biloba Extract in the shipment concerned, accompanied this First Shipment and the Second through Sixth Shipments. These Beijing Refine Certificates of Analysis are not signed and sealed, raising the issue whether they are English translations of original Chinese language versions that are not part of the record in this proceeding, or merely restatements of what appears in the manufacturer Dongling's Certificate of Analysis. For each Shipment, however, Beijing Refine did submit in support of Dongling's documentation, two different signed and sealed statements in support of the Ginkgo Biloba Extract shipment: in one of these statements, Beijing Refine stated that the material in the batch was identified as Ginkgo Biloba Extract, species of origin Ginkgo Biloba Leaf. In the other signed and sealed statement, Beijing Refine stated that the Ginkgo Biloba Extract in the batch did not contain any equine, ruminant, swine, or avian species or their material. All of these documents were available to HRIECO which sent them to APIIG (R-138 through R-143).

[23] According to APIIG, Beijing Refine holds FDA Facility Registration Number 14585147874, but only the first shipment referenced this number. The remaining five shipments referenced a different Registration Number, 12805160072, which APIIG states is the number of a different, unidentified, company (APIIG Decl. ¶ 43): but see APIIG Decl. ¶ 32 and note 4 stating Beijing Refine's Registration Number is 12805160072).

[24] On this invoice, HRIECO listed Vita Pharma International Co., Limited, as Beneficiary, and included an invoice and a packing slip from Vita Pharma International Co., Limited that was substantially identical to HRIECO's invoice and packing slip.

114.    This First Shipment arrived at the Port of New York, was admitted, and delivered to APIIG on March 21, 2019, (APIIG Decl. ¶ 11), which sold and delivered it to Liptis USA, on terms requiring payment to APIIG within 30 days of delivery (Sharif Omar Testimony). APIIG paid HRIECO's invoice on July 30, 2019 (APIIG Decl. ¶ 11).[25]

115.    As a general matter, upon delivery of the imported shipment to APIIG, APIIG must have a sample of the shipment tested by a third party testing laboratory to verify the identity of the product (Sharif Omar Testimony). APIIG itself does not test the product: its practice was to transfer the shipment to Liptis USA, which then arranged for identification testing, and held the ingredients (and any at-risk material or finished product it produced that incorporated the untested ingredients) in quarantine pending the results of the test (Sharif Omar Testimony).

116.    During the course of discovery in this proceeding, APIIG declined to produce documents, if any, reflecting any testing performed on the First Shipment (R-144), and makes no claim that the First Shipment failed testing. There were no issues with the Ginkgo Biloba Extract delivered with the First Shipment, which was "consumed" (APIIG Reply Decl. ¶ 20). There are no test results for this First Shipment of Ginkgo Biloba Extract in the record of this proceeding.

### 2.    The Second Shipment

117.    On March 10, 2019, Dongling manufactured batch 201903006 of Ginkgo Biloba Extract USP 35, and tested that batch for compliance with USP 35 criteria (R-145), using HPLC testing methodology (R-139). Dongling determined that the batch met USP 35 criteria, that total flavone glycosides were greater than or equal to 24%, and that total terpene lactones were greater than or equal to 6%; issued a Certificate of Analysis certifying compliance with the contractually required USP 35 and 24/6 standards (R-139),[26] and released that batch for shipment to APIIG. Golden-Shell manufactured and tested a batch of Glucosamine, determined that it met the agreed criteria, issued a Certificate of Analysis certifying compliance, and released that batch for shipment to APIIG. HRIECO provided each of these Certificates of Analysis, together with the Statements from Beijing Refine, and the commercial documents including the bill of lading, to APIIG (R-139).

118.    On April 15, 2019, HRIECO issued an invoice to APIIG, specifying payment due 90 days from Bill of Lading as provided in the 2019 Supply Agreement (C-12, R-139). This invoice named HRIECO as "Facility Name of Supplier" with DUNS number and FDA Registration number 11529498370. It also named Golden-Shell with FDA Registration Number 10892543018 as "Manufacturer Facility Name" for Glucosamine, and Beijing Refine with FDA Registration

---

[25] There are no documents in the record reflecting APIIG's payments to HRIECO or Liptis USA's payments to APIIG, for the First Shipment or for any of the other shipments under the 2019 Supply Agreements.

[26] Note 22.

Number 12805160072 as "Manufacturer Facility Name" for Ginkgo Biloba Extract (R-139).[27] HRIECO also supplied a Packing List, which referenced the Invoice, and, as with the First Shipment, listed 532 packages comprising 520 cartons of Glucosamine Sulfate and 12 barrels of Ginkgo Biloba Extract, having a total gross weight of 14116 KGS, measuring 30 CBM (R-139).[28]

119.    On April 18, 2019, at the Port of Shanghai, Golden-Shell, described on the carrier's Bill of Lading as Shipper / Exporter, delivered or caused to be delivered to the carrier 532 cartons of Ginkgo Biloba Extract and D-Glucosamine Sulfate 2KCL, "Shipper's Load, Count & Seal," having a gross weight of 14116 KGS and measuring 30 CBM, which were received and loaded on board the carrier on April 18, 2019 (R-26, R-139). The Bill of Lading does not name Dongling or Beijing Refine.

120.    This Second Shipment arrived at the Port of New York, was admitted, and received by APIIG on May 15, 2019, (APIIG Decl. ¶ 12), which sold and delivered it to Liptis USA, which was required to pay APIIG within 30 days of delivery (Sharif Omar Testimony). APIIG paid HRIECO's invoice on August 19, 2019 (APIIG Decl. ¶ 12).

121.    As with the First Shipment, during the course of discovery in this proceeding, APIIG declined to produce documents, if any, reflecting any testing performed on the Second Shipment (R-144), and makes no claim that the Second Shipment failed testing. There were no issues with the Ginkgo Biloba Extract delivered with the Second Shipment, which was "consumed" (APIIG Reply Decl. ¶ 20). There are no test results for this Second Shipment of Ginkgo Biloba Extract in the record of this proceeding.

### 3.    The Third Shipment

122.    On May 23, 2019, Dongling manufactured batch 201905007 of Ginkgo Biloba Extract USP 35, and tested that batch for compliance with USP 35 criteria (R-145), using HPLC testing methodology (R-140). Dongling determined that the batch met USP 35 criteria, that total flavone glycosides were greater than or equal to 24%, and that total terpene lactones were greater than or equal to 6%; issued a Certificate of Analysis certifying compliance with the contractually required USP 35 and 24/6 standards (R-140),[29] and released that batch for shipment to APIIG. Golden-Shell manufactured and tested a batch of Glucosamine, determined that it met the agreed

---

[27] Note 23.

[28] As with the First Shipment, on this invoice, HRIECO listed Vita Pharma International Co., Limited, as Beneficiary, and included an invoice and a packing slip from Vita Pharma International Co., Limited that was substantially identical to HRIECO's invoice and packing slip.

[29] Note 22.

criteria, issued a Certificate of Analysis certifying compliance, and released that batch for shipment to APIIG. HRIECO provided each of these Certificates of Analysis, together with the Statements from Beijing Refine, and the commercial documents including the bill of lading, to APIIG (R-140).

123.    On June 6, 2019, HRIECO issued an invoice to APIIG, specifying payment due 90 days from Bill of Lading as provided in the 2019 Supply Agreement (R-140). Again, this invoice named HRIECO as "Facility Name of Supplier" with DUNS number and FDA Registration number 11529498370. It also named Golden-Shell with FDA Registration Number 10892543018 as "Manufacturer Facility Name" for Glucosamine, and Beijing Refine with FDA Registration Number 12805160072 as "Manufacturer Facility Name" for Ginkgo Biloba Extract (R-140).[30] HRIECO also supplied a Packing List with the Invoice, and, as with the First and Second Shipments, listed 532 packages comprising 520 cartons of Glucosamine and 12 barrels of Ginkgo Biloba Extract, having a total gross weight of 14116 KGS, measuring 30 CBM (R-140).[31]

124.    On June 13, 2019, at the Port of Shanghai, Golden-Shell, described on the carrier's Bill of Lading as Shipper / Exporter, delivered or caused to be delivered to the carrier 532 packages of Ginkgo Biloba Extract [and] D-Glucosamine Sulfate 2KCL, "Shipper's Load, Count & Seal," having a gross weight of 14116 KGS and measuring 30 CBM, which were received and loaded on board the carrier on June 13, 2019 (R-27, R-140). The Bill of Lading does not name Dongling or Beijing Refine

125.    The Third Shipment arrived at the Port of New York, was admitted, and delivered to APIIG on July 9, 2019 (APIIG Decl. ¶ 13), which sold and delivered it to Liptis USA, which was required to pay APIIG within 30 days of delivery (Sharif Omar Testimony). By the terms of the 2019 Supply Agreement, APIIG was required to pay HRIECO's invoice within 90 days of the date of the Bill of Lading, and paid it on September 17, 2019 (APIIG Decl. ¶ 13).

126.    On or about the September 17, 2019 date when APIIG paid HRIECO's invoice, Liptis USA, having previously purchased the Third Shipment from APIIG, sent what was described as a sample of the Ginkgo Biloba Extract from the Third Shipment (i.e. from Dongling Batch 201905007), to a third party laboratory, NSF International ("NSF") of Petaluma, California, which reported it received this sample on September 19, 2019 (Kababick Repl. Dec. Ex. G,

---

[30] Note 23.

[31] HRIECO named itself, not Vita Pharma International Co., Limited, as Beneficiary on this Invoice.

second document; C-16).[32] NSF's contractor proceeded to test that sample using a methodology known as HPTLC chromatography, a testing method different to that used by Dongling (Ibid.).

127. NSF delivered its report, dated September 30, 2019 ("NSF September 30, 2019 Report"), to Liptis USA. NSF reported:

> The chromatographic profile of sample 04-231 is not consistent with the profiles of the reference materials. Therefore, this test sample (04-231) is not characteristic of Ginkgo biloba leaf extract (Ibid.).

128. Sharif Omar of APIIG informed Xia Li of HRIECO of the result. Xia Li checked with the manufacturer, Dongling, and responded on October 10, 2019 (R-102):

> Do you get any certificate from laboratory for ginkgo biloba extract? We contacted with our factory. We supplied ginkgo biloba as you ordered.
> It is impossible to supply other extracts. So we are still arranging shipment of pending order for ginkgo and glucosamine this week. Pls kindly note.
>
> If you really got any lab result, pls let us know. Thanks!

129. Sharif Omar of APIIG sent a copy of the NSF September 30, 2019 Report, and stated:

> Analysis report is attached which shows that the sample is not ginkgo biloba leaf extract. Another sample of the same batch was sent to a second lab for confirmation (R-102, Oct. 11, 2019).[33]

130. After checking again with Dongling, Xia Li responded with an attached detailed explanation prepared by Dongling, and invited Sharif Omar to contact her immediately if he had any remaining questions after reviewing Dongling's explanation:

> Tks for your NSF lab test result.
>
> We checked with factory of ginko biloba extract. They told us for natural plant extract, it is not accurate to use HPTLC to determine. PLs kindly check attached detailed

---

[32] There are no documents in the record reflecting the chain of custody for this sample described as from the Third Shipment or for any of the other samples sent to labs, described as samples from the Fourth through Sixth Shipments. APIIG declined to produce such documents, or any communications with the laboratories (R-144).

[33] There are no documents in the record reflecting that another sample from the same batch, i.e., the Third Shipment, was sent to a second lab for testing. In addition, the record supports Xia Li's testimony that the September 30, 2019 NSF Report for the Third Shipment was the only lab report APIIG sent to HRIECO before initiating this arbitration.

explanation from the quality department. . . . It shows why this HPTLC is not accurate and how to examine the real ginko biloba in test.

If you still have uncleared questions, pls let me know immediately. WE will be glad to solve you problem ASAP (R-15, R-82, Oct. 14, 2019).

131.    The documents prepared by Dongling, (C-19, R-15), were:

The Explanation of the HPTLC result of Ginkgo Biloba Extract;
The difference of Ginkgo Biloba Extract in USP <35> and USP <41> Grade;  and
Explanation to the questions of Free Quercetin, Kaemperol in Ginkgo Biloba Extract, and the correct identification method.

132.    Dongling stated that the methodology used by NSF, described in the NSF September 30, 2019 Report, was not the correct methodology for testing Ginkgo Biloba Extract. Among other reasons, NSF used different reference material, and only ethanol and water to remove the extract, whereas Dongling had to use resin adsorption, remove Ginkgolic acid, and process the material again in order to remove the pesticide residue to meet APIIG's requirements on pesticide content (C-19, R-15).

133.    In other words, in the test reported in the NSF September 30, 2019 Report, NSF had tested a sample of the Ginkgo Biloba Extract that Dongling manufactures to USP 35 standard, in order to determine whether Dongling's ingredient met then-current USP standard, USP-40 (or later), which, as with USP 37 (Second Supplement) (R-98, p.3), had among its criteria that quercetin content be not more than 0.05%: "Acceptance criteria: NMT 4% of rutin and NMT 0.5% of quercetin" (R-145, R-33).

134.    HRIECO and Dongling previously had advised APIIG twice, once during July 2017, and again in October 2018, that Dongling could manufacture to the USP 35 standard, but not to the criteria set forth in USP 37 (Second Supplement) and later monographs, because quercetin quantities in its extract would be higher than the 0.05% limit permitted by those later monographs. This was because Dongling (as well as other Chinese manufacturers) must process their material again to remove pesticide residue in order to satisfy requirements on the removal of pesticide residue. See ¶¶ 57-64 (2017) and ¶¶ 71-74 (2018), above. This is why APIIG, which represented to HRIECO during the December 2018 negotiations for the 2019 Supply Agreements that Liptis USA sells its finished product in markets where prices are fixed by the government, i.e. outside the United States, had accepted USP 35 grade Ginkgo Biloba Extract processed for pesticide removal since at least 2017.

135.    In its explanation responding to the NSF September 30, 2019 Report, Dongling again referred to its October 9, 2018 memorandum explaining the difference between USP 35 and USP 41 grades:

during the process, the Quercetin and Rutin [in the leaf] will turn to free Quercetin and free Kaemperol, especially during the process of removing pesticide residue.

I remember last year [in October 2018], I already sent a document to explain the difference of USP 35 and USP 41 grade Ginkgo Biloba Extract. The difference of USP 35 and USP 41 Ginkgo Biloba Extract is just to control the content of free quercetin. I had explained it in that document, and I also attach it again, you can check it (C-19, R-15).

136.    According to Xia Li of HRIECO, APIIG did not respond to her October 14, 2019 email, in which she asked Sharif Omar to let her know immediately if he had any remaining questions after reviewing the Dongling explanation. Nor did he send her a second report, from a second laboratory, after receiving Dongling's explanations. There are no documents in the record reflecting any such response or report. APIIG appeared to HRIECO to have accepted Dongling's explanations.

137.    According to APIIG, "the goods could not be sold to our customer(s) and the goods could not be resold in the U.S. dietary supplements market unless a retest showed that the goods were not adulterated" (APIIG Decl. ¶ 14). When it received the NSF September 30, 2019 Report, Liptis USA "quarantined before destroying" the Gingko Biloba Extract from the Third Shipment as well as other products with which it had been mixed before Liptis USA received the NSF September 30, 2019 Report (APIIG Decl. ¶ 15).

### 4.    The Fourth Shipment

138.    On July 11, 2019, Dongling manufactured batch 201907008 of Ginkgo Biloba Extract USP 35, and tested that batch for compliance with USP 35 criteria (R-145), using HPLC chromatography (R-141). Dongling determined that the batch met USP 35 criteria, that total flavone glycosides were greater than or equal to 24%, and that total terpene lactones were greater than or equal to 6%; issued a Certificate of Analysis certifying compliance with the contractually required USP 35 and 24/6 standards (R-141),[34] and released that batch for shipment to APIIG. Golden-Shell manufactured and tested a batch of Glucosamine, determined that it met the agreed criteria, issued a Certificate of Analysis certifying compliance, and released that batch for shipment to APIIG. HRIECO provided each of these Certificates of Analysis, together with the Statements from Beijing Refine, and the commercial documents including the bill of lading, to APIIG (R-141).

---

[34] Note 22.

139.    On August 20, 2019, HRIECO issued an invoice to APIIG, specifying payment due 90 days from Bill of Lading as provided in the 2019 Supply Agreement (R-141). Again, this invoice named HRIECO as "Facility Name of Supplier" with DUNS number and FDA Registration number 11529498370. It also named Golden-Shell with FDA Registration Number 10892543018 as "Manufacturer Facility Name" for Glucosamine, and Beijing Refine with FDA Registration Number 12805160072 as "Manufacturer Facility Name" for Ginkgo Biloba Extract (R-141).[35] HRIECO also supplied a Packing List with the Invoice, and, as with the First, Second and Third Shipments, listed 532 packages comprising 520 cartons of Glucosamine and 12 barrels of Ginkgo Biloba Extract, having a total gross weight of 14116 KGS, measuring 30 CBM (R-141).

140.    On August 24, 2019, at the Port of Shanghai, Golden-Shell, described on the carrier's Bill of Lading as Shipper / Exporter, delivered or caused to be delivered to the carrier 532 packages of Ginkgo Biloba Extract [and] D-Glucosamine Sulfate 2KCL, "Shipper's Load, Count & Seal," having a gross weight of 14116 KGS and measuring 30 CBM, which were received and loaded on board the carrier on August 24, 2019 (R-28, R-141). The Bill of Lading does not name Dongling or Beijing Refine.

141.    The Fourth Shipment arrived at the Port of New York, was admitted, and delivered to APIIG on September 18, 2019 (APIIG Decl. ¶ 19), which sold and delivered it to Liptis USA, which was required to pay APIIG within 30 days of delivery (Sharif Omar Testimony). By the terms of the 2019 Supply Agreement, APIIG was required to pay HRIECO's invoice within 90 days of the date of the Bill of Lading, or by November 24, 2019. APIIG paid this invoice (APIIG Decl. ¶ 19), but not until on or about December 31, 2019 (R-99, R-100, R-106).

142.    In late September 2019, Liptis USA, previously having acquired the Fourth Shipment from APIIG, sent a sample described as from the Ginkgo Biloba Extract in the Fourth Shipment (Dongling Batch 201907008) to NSF for testing. NSF reported it received this sample on September 30, 2019 (Kababick Repl. Dec. Ex. G, first document; C-23), and NSF's contractor proceeded to test the sample using HPTLC ID methodology (Ibid.).

143.    NSF delivered its report on the sample from the Fourth Shipment, dated October 21, 2019 ("NSF October 21, 2019 Report"), to Liptis USA, stating:

> The chromatographic profile of sample 04-244 is not consistent with the profiles of the Ginkgo biloba reference materials. Therefore, this test sample (04-244) is not characteristic of Ginkgo biloba leaf extract (Ibid.).

---

[35] Note 23.

144.     Sharif Omar of APIIG states that he verbally informed HRIECO of the result. Xia Li denies that he did so. There are no documents in the record of this proceeding reflecting that APIIG informed HRIECO of the result set forth in the NSF October 21, 2019 Report.

145.     Liptis USA sent another sample described as from the Ginkgo Biloba Extract in the Fourth Shipment to a second laboratory, Flora Labs,[36] which conducted tests using HPTLC and HPLC methodologies (APIIG Decl. ¶ 22).

146.     In its December 12, 2019 report ("Flora Labs December 12, 2019 Report") Flora Labs, using an HPTLC method of analysis, concluded:

> Sample does not conform to reference profile for Ginkgo (*Ginkgo biloba*) Leaf Extract.
> Sample **appears to be** adulterated with exogenous quercetin.
> (C-24; Kababick Decl. Ex. C, emphasis added).

147.     In its December 13, 2019 report ("Flora Labs December 13, 2019 Report"), Flora Labs, using an HPLC method of analysis, concluded that the sample described as from from the Fourth Shipment contained a 2.89% result of quercetin (C-25; Kababick Decl. Ex. D). Mr. Kababick stated in his May 4, 2022 Declaration with regard to this report "I understand that the standard called for in each of the Supply Agreements at issue is that the product is not adulterated. On this standard, the HPLC test confirmed that the sample was adulterated" (Kabick Decl. ¶ 18).

148.     In other words, NSF and Flora Labs tested samples described as of the Fourth Shipment that Dongling certified it manufactured to the USP 35 standard specified in the 2019 Supply Agreements, with processing to remove pesticide residue, against reference materials prepared to the newer, USP 40 (or later) standard, not the USP 35 standard, in order to determine whether Dongling's ingredient met the different, newer, USP 40 (or later) standard, and concluded that it did not. The newer standard required the ingredient contain no more than 0.05% of quercetin, i.e., "Acceptance criteria: NMT 4% of rutin and NMT 0.5% of quercetin," a standard that Dongling, during 2017 and 2018, had advised the parties it could not meet, leading HRIECO and APIIG (which told HRIECO the finished product containing the ingredient was not sold in the United States) to contract, in 2018, and again in 2019, to the USP 35 standard for product that was, additionally, processed to remove pesticide residue. The Flora Labs December 12, 2019 Report found elevated levels of quercetin and concluded that the sample from the Fourth Shipment "**appears to be** adulterated with exogenous quercetin" (C-24; Kababick Decl. Ex. C, emphasis added).

149.     According to Sharif Omar of APIIG, after receiving these reports, Liptis USA quarantined the Fourth Shipment of Ginkgo Biloba Extract without mixing it with any other

---

[36] James Kababick of Flora Labs has testified as an expert witness in this proceeding, appointed by APIIG.

product (APIIG Decl. ¶ 24: "because adulterated goods were again delivered, the goods were quarantined without being mixed into other products and destroyed"; but see Liptis Decl. ¶ 13 listing costs of $220,812.77 associated with blending the ingredient from the Fourth Shipment with two other products). Sharif Omar of APIIG states that he informed HRIECO of the results of NSF testing on the Fourth Shipment (APIIG Decl. ¶ 21). Xia Li denies that he did so. There are no documents in the record of this proceeding reflecting that APIIG informed HRIECO of the results set forth in any of the three Reports on the Fourth Shipment.

150.    APIIG submits that after Liptis received two consecutive tests on samples from the Fourth Shipment from different laboratories using the HPTLC testing methodology, i.e., the NSF October 21, 2019 Report and the Flora Labs December 12, 2019 Report, APIIG was required to treat HRIECO as "disqualified" as a supplier of Ginkgo Biloba Extract (APIIG Decl. ¶ 25).

151.    As discussed below, APIIG paid the invoice for the Fourth Shipment more than a month after it was due, and did not pay the invoices for the Fifth and Sixth Shipments.

### 5.    The Fifth Shipment

152.    On September 10, 2019, Dongling manufactured batch 201909002 of Ginkgo Biloba Extract USP 35, and tested that batch for compliance with USP 35 criteria (R-145), using HPLC chromatography (R-142). Dongling determined that the batch met USP 35 criteria, that total flavone glycosides were greater than or equal to 24%, and that total terpene lactones were greater than or equal to 6%; issued a Certificate of Analysis certifying compliance with the contractually required USP 35 and 24/6 standards (R-142),[37] and released that batch for shipment to APIIG. Golden-Shell manufactured and tested a batch of Glucosamine, determined that it met the agreed criteria, issued a Certificate of Analysis certifying compliance, and released that batch for shipment to APIIG. HRIECO provided each of the Certificates of Analysis, together with the Statements from Beijing Refine, and the commercial documents including the bill of lading, to APIIG (R-142).

153.    The Fifth Shipment had been scheduled to ship during mid-October (C-1, R-97), but shipment from Shanghai to New York was delayed to November 26, 2019, due to a random spot check by the Chinese government (R-97). On November 22, 2019, HRIECO issued an invoice to APIIG, specifying payment due 90 days from Bill of Lading as provided in the 2019 Supply Agreement (R-142). Again, this invoice named HRIECO as "Facility Name of Supplier" with DUNS number and FDA Registration number 11529498370. It also named Golden-Shell with FDA Registration Number 10892543018 as "Manufacturer Facility Name" for Glucosamine, and Beijing Refine with FDA Registration Number 12805160072 as "Manufacturer Facility Name" for Ginkgo Biloba Extract (R-142).[38] HRIECO also supplied a Packing List with the Invoice,

---

[37] Note 22.

[38] Note 23.

and, as with the First through Fourth Shipments, listed 532 packages comprising 520 cartons of Glucosamine and 12 barrels of Ginkgo Biloba Extract, having a total gross weight of 14116 KGS, measuring 30 CBM (R-142), i.e., the same as the previous First through Fifth Shipments.

154.    On November 26, 2019, at the Port of Shanghai, Golden-Shell, described on the carrier's Bill of Lading as Shipper / Exporter, delivered or caused to be delivered to the carrier 532 packages of Ginkgo Biloba Extract [and] D-Glucosamine Sulfate 2KCL, "Shipper's Load, Count & Seal," having a gross weight of 14116 KGS and measuring 30 CBM, which were received and loaded on board the carrier on November 26, 2019 (R-29, R-142). The Bill of Lading does not name Dongling or Beijing Refine. On November 28, 2019, HRIECO sent APIIG an email attaching the documents associated with the shipment, including the invoice, packing slip, bill of lading, and certificates of analysis from the manufacturers (R-142).

155.    The Fifth Shipment arrived at the Port of New York, was admitted, and received by APIIG on January 2, 2020, and APIIG or Liptis USA quarantined the Ginkgo Biloba Extract in this shipment (APIIG Decl. ¶ 26). APIIG sold the Glucosamine in this shipment to Liptis USA. By the terms of the 2019 Supply Agreement, APIIG was required to pay HRIECO's invoice totaling USD 151,190, which covers both Ginkgo Biloba Extract (USD 31,590) and Glucosamine (USD 119,600), within 90 days of the date of the Bill of Lading, or on February 24, 2020. APIIG did not pay this invoice (APIIG Decl. ¶ 26).

156.    According to APIIG, it was required under standard operating procedures "of a customer of API[IG]"[39] to quarantine the Ginkgo Biloba Extract in this Fifth Shipment and to disqualify HRIECO, as of December 12, 2019, "as a responsible supplier of goods" because Liptis USA had received two failed HPTLC tests on the Ginkgo Biloba Extract in the prior Fourth Shipment from two different testing laboratories, i.e. NSF on October 21, 2019, and Flora Labs on December 12, 2019 (APIIG Decl. ¶ 26, 25).

### 6.    The Sixth Shipment

157.    On November 5, 2019, APIIG contacted HRIECO requesting the Sixth Shipment "as soon as possible" (R- 97). On November 12, 2019, Dongling manufactured batch 201911007 of Ginkgo Biloba Extract USP 35, and tested that batch for compliance with USP 35 criteria (R-145), using the HPLC testing methodology (R-143). Dongling determined that the batch met USP 35 criteria, that total flavone glycosides were greater than or equal to 24%, and that total terpene lactones were greater than or equal to 6%; issued a Certificate of Analysis certifying compliance with the contractually required USP 35 and 24/6 standards (R-143),[40] and released

---

[39] APIIG has testified that it sells exclusively to Liptis USA. APIIG declined to produce the referenced standing operating procedures (R-144).

[40] Note 22.

that batch for shipment to APIIG. Golden-Shell manufactured and tested a batch of Glucosamine, determined that it met the agreed criteria, issued a Certificate of Analysis certifying compliance, and released that batch for shipment to APIIG. HRIECO provided each of these Certificates of Analysis, together with the Statements from Beijing Refine, and the commercial documents including the bill of lading, to APIIG (R-143).

158.    On December 10, 2019, HRIECO issued an invoice to APIIG, specifying payment due 90 days from Bill of Lading as provided in the 2019 Supply Agreement (R-143). Again, this invoice named HRIECO as "Facility Name of Supplier" with DUNS number and FDA Registration number 11529498370. It also named Golden-Shell with FDA Registration Number 10892543018 as "Manufacturer Facility Name" for Glucosamine, and Beijing Refine with FDA Registration Number 12805160072 as "Manufacturer Facility Name" for Ginkgo Biloba Extract (R-143).[41] HRIECO also supplied a Packing List with the Invoice, and, as with the First through Fifth Shipments, listed 532 packages comprising 520 cartons of Glucosamine and 12 barrels of Ginkgo Biloba Extract, having a total gross weight of 14116 KGS, measuring 30 CBM (R-143).

159.    On December 13, 2019, (one day after APIIG disqualified HRIECO as a supplier of Ginkgo Biloba Extract), at the Port of Shanghai, Golden-Shell, described on the carrier's Bill of Lading as Shipper / Exporter, delivered or caused to be delivered to the carrier 532 packages of Ginkgo Biloba Extract [and] D-Glucosamine Sulfate 2KCL, "Shipper's Load, Count & Seal," having a gross weight of 14116 KGS and measuring 30 CBM, which were received and loaded on board the carrier on December 13, 2019 (R-30, R-143). The Bill of Lading does not name Dongling or Beijing Refine. On December 19, 2019, HRIECO sent APIIG an email attaching the documents associated with the shipment, including the invoice, packing slip, bill of lading, and certificates of analysis from the manufacturers (R-143).

160.    The Sixth Shipment arrived at the Port of New York, was admitted, and received by APIIG on January 7, 2020 (APIIG Decl. ¶ 27). APIIG or Liptis USA quarantined the Ginkgo Biloba Extract in this shipment (APIIG Decl. ¶ 27), and APIIG sold the Glucosamine in this shipment to Liptis USA. By the terms of the 2019 Supply Agreement, APIIG was required to pay HRIECO's invoice totaling USD 151,190, which covers both Ginkgo Biloba Extract (USD 31,590) and Glucosamine (USD 119,600), within 90 days of the date of the Bill of Lading, or on March 12, 2020. APIIG did not pay this invoice (APIIG Decl. ¶ 27), for the same reasons it did not pay the invoice for the Fifth Shipment (see ¶ 156 above).

---

[41] Note 23.

**C.      Collection Efforts. No Commitment for 2020.**

**1.      Late Payment for the Fourth Shipment**

161.    On November 26, 2019, HRIECO's Haris Shen commenced emailing APIIG's Maha Emam[42] requesting payment of the invoice for the Fourth Shipment, which had been due on November 24: "Pls pay the payment and inform us ASAP" (R-99, Nov. 26, 2019). Maha Emam responded: "I have received your email and will inform you of payment" (R-104, Nov. 26, 2019). HRIECO wrote on December 2: "May I know the payment schedule?" (R-99), and on December 6: "Pls help us arrange the payment and inform us with many thanks" (R-99).

162.    HRIECO wrote on December 10, again requesting payment for the Fourth Shipment:

"This payment  has also been delayed for two weeks  and we have reminded you several times, pls advsie [sic] if the payment will be finished this week" (R-99, Dec. 10, 2019).

163.    Maha Eham of APIIG responded two days later:

My apologies for the delay. The authorized signers will return next week and payment will be processed then. I will keep you updated (R-99, Dec. 12, 2019).

164.    HRIECO promptly responded, thanked APIIG for the information, and said it did not want to be in the position of charging APIIG interest for late payments:

we hope this payment will be finished next week .

Recently your payment was late sometimes. We do not want to charge you any extra bank interests. Could you pls pay on time next time?  thank you (R-99, Dec. 12, 2019).

165.    The following week, HRIECO wrote again, asking for time and confirmation of payment:

Please advise the time of payment and send us the payment bank slip with many thanks (R-99, Dec. 16, 2019).

166.    APIIG's Maha Emam responded: "I will keep you updated" (R-99, Dec. 17, 2019).

167.    On December 18, 2019, Xia Li of HRIECO also asked Sharif Omar of APIIG for payment of the invoice for the Fourth Shipment, in the context of a discussion about planning for 2020 (R-100; see 170-176 ¶¶ below). On December 20, Haris Shen of HRIECO followed up by continuing to ask his counterpart, Maha Emam of APIIG, for payment:

---

[42] Maha Eham replaced Jenny Avalos of APIIG as of November 2019 (R-112, Nov. 4, 2019).

Can the payment will be finished before the holiday? (R-106).

168.    Ten days later, not having received the payment, Haris Shen wrote again to Maha Eham:

This payment  has also been delayed for one month and we have reminded you several times, pls advsie [sic] when you will pay the payment (R-106, Dec. 30, 2019).

169.    The next day, on December 31, 2019, Haris Shen wrote to advise Maha Eham that HRIECO finally had received the payment for the Fourth Shipment: "We received the payment , thanks for your support all time" (R-106). Maha Eham of APIIG promptly responded with apologies for the delay (R-106, Dec. 31, 2019). At this point, the Fifth and Sixth Shipments were en route to New York.

## 2.       No Commitment for 2020

170.    During this period, on December 3, 2019, as Golden-Shell was preparing to ship the Sixth Shipment from Shanghai, Xia Li of HRIECO emailed Sharif Omar of APIIG, to discuss APIIG's annual requirements of Glucosamine and Ginkgo Biloba Extract for the year 2020:

May I know what is your next year's purchase plan for glucosamine and ginkgo? How about your sales this year?
We are waiting for your opinion sharing. Thank you (R-101, Dec. 3, 2019).

171.    Sharif Omar responded:

We will be working on our 2020 plan after we close out 2019 and we will revert back to you once we have the information (R-101, Dec. 5, 2019).

172.    On December 18, Xia Li wrote again, requesting the forecast for 2020. She also took the opportunity to request payment for the Fourth Shipment:

Can we get some forcast demand for 2020 before your christmas holiday?
Also we have one overdue payment which is expired nearly 24days. Could you pls kindly help us to advise your payment schedule immediately?  (R-100, Dec. 18, 2019).

173.    Sharif Omar responded to the request for payment but did not address the forecast for 2020 (R-100, Dec. 19, 2019): "Please send me a copy of the referenced invoice so I can check with accounting." Nor did he mention the results of the three tests on the Fourth Shipment or that APIIG had disqualified HRIECO as a supplier of Ginkgo Biloba Extract. Xia Li promptly sent another copy of the invoice for the Fourth Shipment (R-100). At this point, the Fifth and Sixth

Shipments of Glucosamine and Ginkgo Biloba Extract were en route to New York; they would not be received by APIIG until, respectively, January 2, 2020, and January 7, 2020.

174.    On January 7, 2020, Xia Li wrote:

> Still now we did not get your positive demand quantity. I am wondering when is convenient to call you to talk about the purchase plan in 2020.
> If you have any hesitiation, [sic] pls also let me know (R-103).

175.    Again, Sharif Omar did not tell Xia Li that APIIG had disqualified HRIECO as a supplier of Ginkgo Biloba Extract. Nor did he disclose the results of the three tests performed on the Fourth Shipment. He responded:

> As mentioned in my earlier email, we have large stocks with the recent shipments and we will evaluate further demand after those goods arrive and are distributed (R-103, Jan. 7, 2020).

176.    As late as February 26, 2020, APIIG had not notified HRIECO of any plans regarding orders for Glucosamine and Ginkgo Biloba Extract for the year 2020 (R-108, Feb. 26, 2020, emails between Haris Shen of HRIECO and Maha Eham of APIIG).

### 3.    No Payments for the Fifth and Sixth Shipment

177.    On February 26, 2020, Haris Shen wrote to Maha Eham of APIIG, asking her to help arrange on-time payment of the invoice for the Fifth Shipment:

> Pls help us arrange the payment on time and inform us with many thanks (R-108).

178.    Haris Shen also recommended planning 2020 purchases, telling Maha Eham that the pandemic situation had stabilized and the factory already had recovered production:

> We hope you already checked your stock situation.  In 2020, now epidemic situation is better.  So factory already recover production. Orders and logistics will come into peak in these months. So pls better plan your purchase for this year in advance (R-108, Feb. 26, 2020).

179.    Maha Eham promptly responded:

> Yes- I will do my best with regards to the payment. And I will pass along the good news for the recovery of factory production- that's wonderful (R-108, Feb. 26, 2020).

180.    Xia Li of HRIECO discussed payment of the invoices with Sharif Omar of APIIG during March 2020 (C-26). At this point, APPIG had not paid the invoice for the Fifth Shipment, due on or about February 24, 2020, and payment of the invoice for the Sixth Shipment would be due on or about March 12, 2020.

181.    On March 11, 2020, referring to a call between them, Xia Li of HRIECO e-mailed Sharif Omar of APIIG, attaching additional information from Dongling about testing methodology, and offering additional confirmation that Dongling, described as a top three exporter of Ginkgo Biloba Extract, did not adulterate its product (R-23, R-83, C-26). Xia Li suggested that the NSF test result previously obtained by Liptis USA (the NSF September 30, 2019 Report, the report APIIG sent to HRIECO) indicated that NSF may not have been familiar with Ginkgo Biloba Extract. She therefore enclosed for APIIG and NSF several additional documents, provided by Dongling, including documents reflecting the correct method for testing for adulteration as suggested and used by the China Food & Drug Administration (CFDA), and a document from Dongling stating "the manufacturing site, manufacturing processes and the specifications of Ginkgo Biloba Extract produced by our company have not changed since 2015." Xia Li wrote:

> Hope everything is clear. If you or your lab still have doubt, pls do not hesitate to contact us. We are here to help you to solve the problem (R-23, C-26, R-83).

182.    APIIG received this email (C-26) but did not respond, according to HRIECO.

183.    HRIECO's Haris Shen sent another e-mail to APIIG's Maha Eham on March 16, 2020, requesting payment of the invoices for the Fifth and Sixth Shipments.[43] APIIG did not pay the invoices for the Fifth and Sixth Shipments of Glucosamine and Ginkgo Biloba Extract, on the basis that APIIG had disqualified HRIECO as a supplier of Ginkgo Biloba Extract.

## 4.    HRIECO's Claim to Sinosure

184.    Sinosure provides trade credit insurance to domestic Chinese commercial entities against certain non-payment risks in commercial transactions with non-domestic buyers.

185.    Sinosure insured HRIECO under a policy of insurance against certain non-payment risks in commercial transactions, including customers' defaults in payment for exported goods, subject to exclusions, including an exclusion for an insured's breach of an underlying contract.[44]

---

[43] Affidavit of Chengzhao Deng, Mar. 4, 2021 ("Chengzhao Deng Aff."), Ex. A (including emails between HRIECO and APIIG). Chengzhao Deng is general manager of the Sinosure Anhui Branch (Chengzhao Deng Aff. ¶ 1).
[44] Chengzhao Deng Aff. ¶ 4.

186. On April 9, 2020, HRIECO, facing a deadline to file a claim (Xia Li Testimony), submitted a claim to Sinosure[45] under this policy for $302,380.00, for APIIG's failure to pay the invoices for the Fifth and Sixth Shipments.[46]

187. On April 9, 2020, HRIECO executed a Collection Trust Deed prepared on Sinosure letterhead, and provided Sinosure with documents reflecting the transactions related to the claim, including the 2019 Supply Agreements. The Collection Trust Deed granted Sinosure the right to collect, in its or HRIECO's name, the amount owed under the invoices for the Fifth and Sixth Shipments, plus interest (C-33).

188. Sinosure began to investigate the claim and, on or about April 24, 2020, retained Brown & Joseph, LLC ("Brown & Joseph"), a firm or collection agency in Illinois, which it authorized to collect from APIIG the amounts owed under the invoices for the Fifth and Sixth Shipments, in Sinosure's or Brown & Joseph's name "for investigation and consultation in an amicable way" (C-35).

189. On April 24, 2020, Brown & Joseph notified APIIG that it had been retained by Sinosure "on behalf of their policy holder [HRIECO]," to collect the amount owed by APIIG under the invoices for the Fifth and Sixth Shipments. Brown & Joseph demanded payment and stated, inter alia: "Your failure to cooperate may result in future import and credit implications of goods from the Peoples Republic of China" (C-36).

190. Brown & Joseph sent APIIG a letter dated May 4, 2020 (C-37), "to serve as formal notice" that Brown & Joseph had been retained and was "attempting to resolve this matter in an amicable fashion between the parties to prevent the need of further action[,]" and repeated that the failure to respond "could affect your future ability to import goods." This letter demanded that APIIG respond within 72 hours or they could escalate the matter including by "initiating legal remedies." The letter ended by inviting "an amicable resolution and immediate response."

191. APIIG retained counsel who engaged with Brown & Joseph during May 2020. During that process, according to APIIG, Brown & Joseph advised APIIG on May 20, 2020 "that this case was not a typical 'collection' matter, but rather a claims resolution process, which was not required by the Supply Agreement, nor was it arbitration required by the Supply Agreement." [47]

192. Thereafter, on May 27, 2020, APIIG initiated this arbitration against HRIECO and Sinosure. There are no later documents in the record of this proceeding that reflect any further involvement of Brown & Joseph.

---

[45] Chengzhao Deng Aff. ¶ 3.

[46] Chengzhao Deng Aff. ¶ 3 and Ex. A.

[47] According to APIIG Affirmative Defenses to HRIECO Counterclaims ¶¶ 211-212. Copies of these communications are not in the record.

193.    In its papers and during the hearing on its motion to dismiss the arbitration as to it, Sinosure represented that it has yet to make a coverage decision on HRIECO's claim because APIIG alleges breach of contract, which, if it were to be established, would exclude coverage under the policy of insurance:

> As breach of contract by the insured is an exclusion to coverage under Sinosure's policy, Sinosure has yet to make a coverage decision pending the result of this arbitration.[48]

> To date Sinosure has not indemnified any portion of [HRIECO's] claim and is withholding rendering a coverage decision until there has been a determination of whether [HRIECO] or [APIIG] was in breach of the contract (Chengzhao Deng Aff ¶ 8).

194.    Sinosure's counsel confirmed during the hearing of its motion to dismiss that Sinosure has determined to await the Final Award in this arbitration before making a coverage decision under HRIECO's policy with Sinosure.

### C.    Invoices from Liptis USA to Liptis Egypt

195.    The USP 40 monograph was in effect from May 1, 2017 (R-145; R-33) and the USP 41 monograph was in effect from May 1, 2020 (¶ 35 above). During the fourth quarter of 2019 and the first half of 2020, Liptis USA invoiced Liptis Egypt for Glucosamine and Ginkgo Biloba Extract, including 7,000 kilograms of Ginkgo Biloba Extract described as USP 37 Grade Ginkgo Biloba Extract that was manufactured in April, July, and August 2019:

> 1000 kg of USP 37 manufactured in April 2019 (R-48, Sep 11, 2019)
> 1000 kg of USP 37 manufactured in April 2019 (R-46, Oct. 7, 2019)
> 1000 kg of USP 37 manufactured in August 2019 (R-49, Nov. 6, 2019)
> 1000 kg of USP 37 manufactured in August 2019 (R-47, Nov. 21, 2019)
> 1000 kg of USP 37 manufactured in August 2019 (R-50, Jan. 6, 2020)
> 1000 kg of USP 37 manufactured in July 2019 (R-52, Feb. 4, 2020)
> 1000 kg of USP 37 manufactured in August 2019 (R-53, Jun. 15, 2020)

## VI.    CONTENTIONS AND REQUESTS FOR RELIEF

### A.    APIIG's Contentions and Requests for Relief

196.    APIIG contends, first, that the terms of the 2019 Supply Agreements required that Beijing Refine, not Dongling, manufacture the Ginkgo Biloba Extract to be delivered under the 2019 Supply Agreements. It contends that APIIG and HRIECO did not agree, in the 2019 Supply

---

[48] Motion of Sinosure to be Dismissed from Arbitration, Mar. 8, 2021, p.3.

Agreements or otherwise, that Dongling manufacture the Ginkgo Biloba Extract. Accordingly, APIIG contends, HRIECO breached the Third through Sixth Supply Agreements by contracting with Dongling to manufacture the Ginkgo Biloba Extract, and by delivering such Dongling-manufactured ingredient, instead of ingredient manufactured by Beijing Refine, under the Third through Sixth Supply Agreements.

197.     APIIG contends, second, that HRIECO supplied Ginkgo Biloba Extract that was "adulterated" and unusable, in breach of the Third through Sixth 2019 Supply Agreements. APIIG submits that four reports that Liptis USA obtained from third party laboratories, during the course of performance, one for the Third Shipment (NSF, C-16, Sep. 30, 2019) and three for the Fourth Shipment (NSF, C-23, Oct. 21; Flora Labs, C-24, Dec. 12; and Flora Labs, C-25, Dec. 13, 2019), support these contentions.

198.     In further support of this second contention, APIIG offers the testimony of its expert, James Kababick, Director of Flora Labs, with reference to: the NSF Reports,[49] the two Flora Labs Reports for the Fourth Shipment dated December 2019,[50] and two additional Flora Labs tests conducted on October 4, 2021, one for the Fifth Shipment, the other for the Sixth Shipment.[51]

199.     APIIG seeks damages and declaratory relief, alleging breach of contract, breach of implied covenant of good faith and fair dealing, and unjust enrichment. It also seeks a declaration of what products were deliverable and what monies were payable under the 2019 Supply Agreements, as well as costs and attorneys' fees.

200.     For its damages, APIIG seeks the return of $63,180, the sum of the amounts paid under invoices for the Ginkgo Biloba Extract in the Third and Fourth Shipments, plus interest, under breach of contract and unjust enrichment theories. It seeks $29,593.69 for inspection, handling, testing, and storage of the goods. APIIG also seeks $371,893.62, an amount charged back to APIIG by Liptis USA, representing costs incurred by Liptis USA for staff, capsules, packaging, storage, and overhead in connection with the Third and Fourth Shipments.[52] Finally, it seeks lost

---

[49] C-16 Third Shipment HPTLC; C-23 Fourth Shipment HPTLC; Kababick Reply Decl. Ex. G.

[50] C-24 Fourth Shipment HPTLC; C-25 Fourth Shipment HPLC; Kababick Reply Decl. Ex. C and D.

[51] Kababick Reply Decl. Ex. F Sixth Shipment and Ex. H Fifth Shipment. Mr. Kababick mistakenly refers to the October 4, 2001 Flora Labs Report on Sample 201911007 as a report on the Third Shipment. Number 201911007, however, is the batch number for the Ginkgo Biloba Extract in the Sixth Shipment, not the Third Shipment. Based on the record in this arbitration, Flora Labs tested samples described as from the Fourth, Fifth, and Sixth Shipments, but not the Third Shipment. There is one report for the Third Shipment and it was conducted by NSF, i.e., the NSF September 30, 2019 Report, the only report sent to HRIECO during the course of performance.

[52] Liptis Decl. ¶ 11).

profits of $973,764.00 on sales to Liptis USA that it contends were lost because the Ginkgo Biloba Extract in the Third through Sixth Shipments was adulterated and unusable. According to APIIG it could not mitigate those losses "because API[IG] exclusively dealt with Liptis Pharmaceuticals USA Inc and did not sell to anyone else."[53]

201.     APIIG contends against Sinosure that when HRIECO submitted a claim to Sinosure under its insurance policy for APIIG's failure to pay for the Fifth and Sixth Shipments, HRIECO triggered "blacklisting" by Sinosure, such that APIIG would not be able to do business on favorable credit terms with other Chinese manufacturers insured by Sinosure, e.g. on terms similar to the favorable payment terms APIIG enjoyed during its relationship with HRIECO.

202.     APIIG also contends against Sinosure, on a broad interpretation, at best, of the Collection Trust Deed, that HRIECO assigned its rights and remedies under the Supply Agreements for the Fifth and Sixth Shipments to Sinosure and that Sinosure therefore is responsible for HRIECO's obligations under the two Supply Agreements including breach of those agreements. APIIG also contends that HRIECO and Sinosure acted together in the breach of the Arbitration Agreement in the Supply Agreements in their debt collection activities.

203.     APIIG has not specified any money damage claims against Sinosure, apart from those it has asserted against HRIECO on the merits of APIIG's claim against HRIECO. Nor has APIIG identified any damages caused by blacklisting, stating "at this point, API[IG]'s only effective way to engage with a new supplier in China would be to visit their site but, with Covid-19 restrictions into and out of China, this option is effectively foreclosed" (APIIG Decl. ¶ 58). APIIG also stated there were no documents reflecting any damages caused by the blacklisting in response to HRIECO's request for documents reflecting any such documents (R-144).

### B.     HRIECO's Contentions and Requests for Relief

204.     HRIECO seeks payment of its unpaid invoices totaling $302,380.00, plus interest, and costs including attorneys' fees. HRIECO contends that the Ginkgo Biloba Extract it supplied under the 2019 Supply Agreements conformed at all times to the USP 35 24/6 standard specified in those agreements and was not "adulterated" or unusable as contended by APIIG.

### C.     Sinosure's Position

205.     Sinosure continues to object to the arbitrator's jurisdiction, and is deemed to have denied all allegations against it.

---

[53] APIIG Post-Hearing Submission, p. 7 (Aug. 10, 2022).

206.    In its submissions on its motion to dismiss, Sinosure pointed out that HRIECO did not assign to it HRIECO's rights and responsibilities under the 2019 Supply Agreements, nor did the Collection Trust Deed confer any such rights; rather, Sinosure received only a limited authorization from HRIECO, under the Collection Trust Deed, to collect, on HRIECO's behalf, the amounts due for the fifth and sixth shipments.[54] Sinosure suspended its US representative's collection activities when APIIG brought this arbitration and has confirmed that it is waiting for the Final Award in this matter before making any coverage decision.

## VII.    ANALYSIS

207.    The undersigned Arbitrator has carefully considered all of the submissions and evidence presented by the Parties in this proceeding, although not every particular argument, filing, or exhibit, is mentioned in this Award.

### A.    Governing Law

208.    APIIG and HRIECO have agreed that New York law including the New York Uniform Commercial Code ("NYUCC") governs the dispute in this arbitration. To recover damages for breach of contract, APIIG and HRIECO also have agreed that a party must prove (i) the existence of a contract, (ii) its performance under the contract, (iii) the other party's breach of the contract, and (iv) damages caused by the breach.[55] Additionally, HRIECO refers to Part 2 of the NYUCC, particularly §§ 2-202, 2-207, 2-208, and 2-209.[56]

### B.    Contract and Breach

#### 1.    The Parties' Contentions

209.    APIIG contends that the parties agreed in the 2019 Supply Agreements that Beijing Refine, not Dongling, would manufacture the Gingko Biloba Extract supplied under these agreements. APIIG relies on the language it instructed HRIECO to insert in the product specification section of the agreements, replacing, in the penultimate draft just prior to signature, EX: ZHEJIANG SHAOXING DONGLING HEALTH FOOD CO., LTD., with EX:BEIJING REFINE BIOLOGY CO., LTD. APIIG also contends that HRIECO supplied "adulterated" and

---

[54] Sinosure Motion, p. 5.

[55] APIIG Submission and Memorandum of Law, May 3, 2022 ("APIIG May 3, 2022 Submission"), p.21, citing Palmetto Partners, L.P. v AJW Qualified Partners, LLC, 83 A.D. 3d 804, 806 (2d Dep't 2011) and other cases; HRIECO Pre-Arbitration Statement, May 4, 2022 ("HRIECO May 4, 2022 Submission"), pp. 16-17, citing Marks v. New York Univ., 61 F. Supp.2d 81, 88 (S.D.N.Y. 1999).

[56] HRIECO Pre-Arbitration Statement, May 27, 2022 ("HRIECO May 27, 2022 Submission"), pp. 8-11.

unusable Ginkgo Biloba Extract, manufactured by Dongling, in the Third through Sixth Shipments, in breach of the 2019 Supply Agreements.

210.    HRIECO contends that the evidence establishes that the parties agreed Dongling would manufacture the Ginkgo Biloba Extract to be supplied under the 2019 Supply Agreements, and that APIIG instructed HRIECO to insert Beijing's name and US FDA Registration number in the 2019 Supply Agreements because Dongling did not have a US FDA Registration Number, whereas Beijing Refine had a US FDA Registration Number, which would lessen the risk of a spot inspection by US FDA at the port of importation.  HRIECO also contends that it supplied 24%/6% USP35 Ginkgo Biloba Extract manufactured by Dongling, as agreed, and that APIIG failed to pay for the Glucosamine and the Ginkgo Biloba Extract delivered in the Fifth and Sixth Shipments, in breach of the 2019 Supply Agreements.

### 2.    Conclusions as to Manufacturer

211.    The evidence establishes, not only by a preponderance, but beyond any reasonable doubt, that APIIG and HRIECO agreed, as they had for many years, that Dongling would manufacture the Ginkgo Biloba Extract to be supplied under the 2019 Supply Agreements.

212.    The evidence also establishes that APIIG instructed HRIECO to insert the name and US FDA Registration Number of Beijing Refine in the Supply Agreement because Beijing Refine had a US FDA Registration number whereas Dongling did not. The evidence establishes that APIIG did so in order to lessen the risk of a spot inspection by the US FDA at the port of importation, and that HRIECO followed that instruction.[57] There is no question on the record of this proceeding that both parties intended and agreed that Dongling would manufacture the ingredient supplied by HRIECO under the 2019 Supply Agreements.[58]

213.    APIIG has acknowledged that it "is duty bound to police what it offers for sale or manufacture and to label its goods properly and accurately (APIIG Decl. ¶ 38), and has recognized the importance of conducting appropriate due diligence when selecting and establishing a relationship with a manufacturer of an ingredient for human consumption (¶¶ 40-41, above, APIIG's due diligence on Dongling). For example, APIIG stated in this proceeding: "at this point, [APIIG's] only effective way to engage with a new supplier in China would be to

---

[57] There is no document in the record of this arbitration showing that any 2019 Supply Agreement, as such, actually was presented to any governmental authority for purposes of importation into the United States, and the Supply Agreements themselves do not appear to have been included with any ISF (Import Security Filing) documentation sent by HRIECO to APIIG (R-138-R-145). In fact, some evidence suggests (but does not establish) that the parties may have relied on shipper (Golden-Shell), supplier (HRIECO), and buyer / importer (APIIG) data rather than manufacturer data for ISF purposes. These three entities had US FDA Registration Numbers.

[58] NYUCC §§ 2-202, 2-204, 2-207, 2-208.

visit their site, but with Covid-19 restrictions into and out of China, this option is effectively foreclosed." (APIIG Decl. ¶ 58).

214.    Although Sharif Omar of APIIG testified that he visited Beijing Refine, there are no documents demonstrating that he did so, that APIIG ever conducted any due diligence on Beijing Refine, or that APIIG or HRIECO ever conducted any negotiations with Beijing Refine. Xia Li of HRIECO testified that she did not introduce APIIG to Beijing Refine, never accompanied Sharif Omar on any visit to Beijing Refine, and had not communicated with Beijing Refine.[59] The first chronological document in the record that refers to Beijing Refine is APIIG's instruction to HRIECO on January 2, 2019 to replace the name Dongling with the name Beijing Refine in the penultimate draft of the agreements.

215.    The evidence establishes beyond any doubt that HRIECO, with the informed consent of APIIG throughout the entire process, negotiated with its long-time manufacturer, Dongling, for the manufacture of Gingko Biloba Extract to be supplied under the 2019 Supply Contracts (¶¶ 79-85, above), leading to execution of the HRIECO-Dongling Agreement (¶¶ 87-88), and thereupon to the exchange of three drafts between HRIECO and APIIG specifying Dongling as manufacturer until Dongling's name was replaced with Beijing Refine in the penultimate draft.

216.    The evidence related to performance following execution of the 2019 Supply Agreements also establishes beyond any doubt that APIIG and HRIECO had agreed that Dongling would manufacture the Ginkgo Biloba Extract supplied to APIIG under the 2019 Supply Agreements.

217.    With each of the six shipments supplied under the 2019 Supply Agreements, HRIECO supplied APIIG with Certificates of Analysis signed and sealed by Dongling, attesting to the Ginkgo Biloba Extract manufactured by Dongling (R-138-R-145). At no time did APIIG ask why Dongling, rather than Beijing Refine, was manufacturing the ingredient.

218.    APIIG placed its first purchase order specifying Dongling as manufacturer for the First Shipment (C-7), and placed subsequent purchaser orders that neither named Dongling nor Beijing Refine, but rather Golden-Shell (C-10, C-13, C-20, C-27, C-30), which manufactured Glucosamine, had a US FDA Registration Number and was listed as Shipper on the Bills of Lading for both ingredients (R-138-R-145). See note 57.

219.    Not once in any of the documents throughout the deliveries of the First through Sixth Shipments and the discussions about the Third through Sixth Shipments did APIIG raise Beijing Refine (¶¶ 111-160, above).

220.    The prior course of dealing from 2012 and particularly from 2014 through 2018 with Dongling, the negotiations for the 2019 Supply Agreements, the drafting history involving

---

[59] Xia Li Testimony. Her communications were with Dongling, with which Beijing Refine cooperated. Ibid.

APIIG's instruction to APIIG on January 2, 2019, to insert the name of a company with a US FDA Registration Number in place of Dongling's name in the penultimate draft, and the course of dealing following execution of the agreements, all support the conclusion that the parties agreed that Dongling would manufacture the Ginkgo Biloba Extract for delivery under the 2019 Supply Agreements.

221.     In sum, the weight of the evidence establishes that APIIG and HRIECO agreed that Dongling would manufacture the Ginkgo Biloba Extract to be supplied under the 2019 Supply Agreements.

### 3.     Conclusions as to Product and Breach

222.     The evidence establishes that the parties agreed in 2019, just as they had agreed in July 2017 (¶¶ 57-64, above), and again in 2018 (C-2), that Dongling would manufacture Ginkgo Biloba Extract in compliance with USP 35 requirements and USP 561 residue pesticide requirements, and in which total flavone glycosides would be greater than or equal to 24% and total terpene lactones would be greater than or equal to 6% (C-1):

> GINKGO BILOBA EXTRACT 24%/6% USP35
> HIGH GRADE (NORMALPARTICLE SIZE)

223.     During July 2017, and again in October 2018, Dongling advised, in response to questions originating with APIIG, that while it would be able to manufacture to USP 35 standard, the standard in effect at the onset of the parties' relationship, it would not be able to manufacture to more recent USP standards such as USP 37 and following, because these newer standards required that quercetin present in the Ginkgo Biloba Extract be less than 0.05%, a criteria that Dongling (and other Chinese manufacturers) could not meet, as they must process the material again to remove pesticide residue in order to comply with USP 561 residue requirements. In that process, the quercetin content of the Ginkgo Biloba Extract is raised beyond the 0.05% limit set by USP 37 and later USP monographs.

224.     This is why HRIECO proposed, and APIIG accepted, USP 35 in the 2019 Supply Agreements (¶ 85, above; C-5, E-mail, Omar Sharif to Xia Li, Dec. 19, 2018, "Ginkgo with the same specifications as the goods currently being provided," and C-1 specifying USP 35).

225.     In sum, the evidence establishes that APIIG and HRIECO agreed in the 2019 Supply Agreements that Dongling would manufacture Ginkgo Biloba Extract in compliance with USP 35 requirements and USP 561 residue pesticide requirements, and in which total flavone glycosides would be greater than or equal to 24% and total terpene lactones would be greater than or equal to 6% (C-1).

226. Historically, Liptis USA has sold finished product containing the Ginkgo Biloba Extract sold to it by APIIG to customers located outside the United States (¶ 26 above). As recently as December 2018, during the negotiations leading to the 2019 Supply Agreements, Sharif Omar of APIIG told HRIECO that Liptis USA sells these finished goods to customers "in markets where [the] sales price is fixed by the government" (R-125, Dec. 5, 2018 ("we sell our finished goods in markets where our sales price is fixed by the government"), i.e. in markets outside the United States, where "our selling price is fixed" (C-5, Dec. 20, 2018).

227. On that testimony, as recently as December 2018, therefore, and previously, APIIG sold USP 35 Grade Ginkgo Biloba Extract to its sole customer, Liptis USA; Liptis USA manufactured, in the United States, finished product containing that USP 35 Grade Ginkgo Biloba Extract; and then sold that finished product containing USP 35 Grade to customers located "in markets where [the] sales price is fixed by the government, i.e., "outside the United States. APIIG does not argue here that it was unlawful to do so.

228. Historically, over different periods and as recently as June 2020, Liptis USA has also invoiced bulk Ginkgo Biloba Extract of various USP grades outside the United States, i.e., to Liptis Egypt (¶ 27; see ¶¶ 75, 195 above). Again, APIIG does not argue here that it was unlawful to do so. Nor would this suggest that there is no market for USP 35 Ginkgo Biloba Extract outside the United States.

229. With each of the six shipments to APIIG under the 2019 Supply Agreements, Dongling provided a Certificate of Analysis certifying compliance with USP 35 requirements and USP 561 residue pesticide requirements, and that total flavone glycosides were greater than or equal to 24% and total terpene lactones were greater than or equal to 6%. These were included in the ISF documents emailed by HRIECO to APIIG for each shipment (R-138-R-143). On each of these Certificates of Analysis, Dongling reported that the quercetin present in the Ginkgo Biloba Extract was greater than 0.05%, as it had advised during 2017 and 2018 would be the case.

230. The First and Second Shipments were received and paid by APIIG without complaint. APIIG declined to produce any documents about their testing (if any), use, or disposition. It is inferred, therefore, that the First and Second Shipments of USP 35 Grade Ginkgo Biloba Extract were sold to Liptis USA, and, whether or not it had the ingredient tested, Liptis USA either included the ingredient in finished product that it sold to customers outside the United States, or sold the bulk product to one or more customers located outside the United States.

231. In September 2019, after acquiring the Third Shipment from APIIG, Liptis USA, as it would do particularly if the ingredient were to be used or consumed in the United States, sent a sample to NSF, which reported on September 30, 2019, that "the chromatographic profile of sample 04-231 is not consistent with the profiles of the reference materials. Therefore, this test sample (04-231) is not characteristic of Ginkgo biloba leaf extract" (NSF September 30, 2019 Report).

232.    In other words, NSF tested the USP 35 sample from the Third Shipment against "reference materials" that were of later USP grade at the time of testing in September 2019, i.e. USP 40 (or later) (R-145; R-33), which USP 40 (or later) reference materials would have contained no more than 0.05% quercetin.

233.    It was a foregone conclusion that the USP 35 sample from the Third Shipment would not pass a test against reference materials based on the USP 40 (or later) standard, because Dongling had already certified that its ingredient contained more than 0.05% quercetin. When NSF stated in its report that "this test sample (04-231) is not characteristic of Ginkgo biloba leaf extract," it was reporting that "this [USP 35] test sample (04-231) is not characteristic of [USP 40 (or later)] Ginkgo biloba leaf extract."

234.    When APIIG sent the NSF September 30, 2019 Report to HRIECO, Xia Li consulted with Dongling and provided APIIG with Dongling's detailed response explaining that it had supplied USP 35 grade as agreed and that, as previously advised, the USP 35 grade ingredient showed more than 0.05% quercetin because it had to be processed to remove pesticide residue.

235.    APIIG did not respond to HRIECO about Dongling's explanation, and did not send HRIECO a second report on the Third Shipment[60] as had been foreshadowed in Sharif Omar's email accompanying the September 30, 2019 Report, so HRIECO reasonably concluded that APIIG was satisfied with Dongling's explanation and continued to conduct business as usual, preparing and delivering the remaining shipments of Glucosamine and Ginkgo Biloba Extract.

236.    Each of the NSF Reports, and the Flora Labs Reports, tested samples from shipments manufactured to USP 35 and processed for pesticide removal (as APIIG had agreed), against "reference materials" that were USP 40, 41, or later, i.e. containing no more than 0.05% quercetin. In each case, therefore, it was a foregone conclusion that USP 35 samples from the Dongling-manufactured ingredients would not pass a test against reference materials based on the USP 40, 41, or later standard, because Dongling had produced USP 35 grade ingredient processed for pesticide removal that contained increased quantities of quercetin, of which APIIG was well aware, and Dongling had certified its ingredient contained more than 0.05% quercetin.

237.    As APIIG's expert, Mr. Kababick explained,

[the NSF and Flora Labs Reports] support the finding that the material does not conform to **current** USP standards. The supplier is not utilizing current official standards for

---

[60] Nor did APIIG inform HRIECO during December 2019 that APIIG had received three reports on the Fourth Shipment, one from NSF and two from Flora Labs, or that APIIG had disqualified HRIECO as a supplier of Ginkgo Biloba Extract as of December 12, 2019, the date of the Flora Labs HPTLC Report, at a time when the Fifth and Sixth Shipments of Glucosamine and Ginkgo Biloba Extract were on the water en route to New York.

ginkgo extract but rather standards that are no longer official and thus that are no longer recognized by the United States FDA (Kababick Reply Decl. ¶ 31, emphasis added).[61]

238.    The NSF and Flora Labs Reports concluded, in sum, that samples of Ginkgo Biloba Extract manufactured to USP 35 by Dongling was not characteristic of Ginkgo biloba leaf manufactured to USP 40, 41, or later. Mr. Kababick concluded that it therefore would be "adulterated" from the point of view of US FDA standards applicable to product sold on the US market, if the bulk Ginkgo Biloba Extract or finished product containing it were to have been mislabeled Ginkgo Biloba Extract, i.e. current USP Ginkgo Biloba Extract, which it was not, and sold in the US market as such. The NSF and Flora Labs Reports, and Mr. Kababick in his testimony, did not conclude or opine, however, that the Dongling ingredient or product containing that ingredient could not have been sold in some jurisdictions outside the United States with appropriate labeling.[62] Nor did NSF or Flora Labs test any samples from Dongling against USP 35 reference materials that had been processed to remove pesticide residue.[63]

239.    The evidence provided by Sharif Omar of APIIG is that APIIG sold to Liptis USA, and Liptis USA manufactured, and sold to customers outside the United States, finished product containing USP 35 Ginkgo Biloba Extract manufactured by Dongling. That is the business model that Sharif Omar of APIIG and Liptis USA described to Xia Li of HRIECO in December 2018 during their negotiations for the 2019 Supply Agreements.

240.    There is no evidence that Liptis USA sold finished product containing USP 35 grade Ginkgo Biloba Extract to any customers in the United States. There is no evidence that Liptis USA sold bulk USP 35 grade Ginkgo Biloba Extract to customers in the United States. There is no suggestion that Liptis USA had any plans to develop and manufacture product for sale in the United States except, perhaps, for its requests to HRIECO during 2018 for any Drug Master File for Gingko Biloba Extract; and its request to NSF to test USP 35 grade Ginkgo Biloba Extract against reference materials that were prepared at current USP standards required by US FDA.

241.    Regardless, APIIG agreed in the 2019 Supply Agreements, as it had in 2017, and in 2018, to purchase USP 35 grade Ginkgo Biloba Extract, well aware that quercetin would exceed 0.05% as a result of processing to remove pesticide residue. APIIG was aware, or should have been aware, that it could not market and sell that USP 35 ingredient as USP 40 or USP 41 (or later) ingredient, in the US market or anywhere else. See, e.g., ¶¶ 71-74, above.

---

[61] In his Reply Declaration, Mr. Kababick also opined after reviewing Dongling's explanation for the amount of quercetin in the ingredient (additional processing to remove pesticide residue), that if a modification to the ingredient's chemical composition had occurred during processing, the material would be "adulterated and illegal to sell in the United States as a dietary supplement unless an NDI was filed with the FDA 75 days before bringing the product to market" and the FDA had not objected (Kababick Reply Decl. ¶¶ 31, 30).

[62] Oral testimony of James Kababick, July 19, 2022.

[63] Ibid.

242. APIIG has not established that HRIECO did not deliver what it agreed to deliver, i.e. Ginkgo Biloba Extract USP 35, having total flavone glycosides greater than or equal to 24% and total terpene lactones greater than or equal to 6%. APIIG has not established that HRIECO breached any of the 2019 Supply Agreements. For the same reasons as those set forth at length above, APIIG has not established any basis for relief under its claims for breach of an implied covenant of good faith and fair dealing, or for unjust enrichment.

243. HRIECO has established that it delivered what it agreed to deliver, i.e., Ginkgo Biloba Extract USP 35, having total flavone glycosides greater than or equal to 24% and total terpene lactones greater than or equal to 6%, processed to remove pesticide residue.

244. HRIECO supplied the ingredient as ordered, and in accordance with the 2019 Supply Agreements. APIIG breached the Fifth and Sixth of the 2019 Supply Agreements when it did not pay HRIECO for the Fifth and Sixth Shipments.

### 4. Conclusions as to Sinosure

245. APIIG has not specified any money damage claims against Sinosure, apart from those it has asserted against HRIECO on the merits of APIIG's claim against HRIECO. Nor has APIIG established that Sinosure acted unreasonably or unlawfully in placing APIIG on its "observed" list for nonpayment of invoices, if indeed Sinosure did so. Moreover, APIIG has not identified any damages caused by blacklisting, stating "at this point, API[IG]'s only effective way to engage with a new supplier in China would be to visit their site but, with Covid-19 restrictions into and out of China, this option is effectively foreclosed" (APIIG Decl. ¶ 58). In addition, APIIG stated that it had no documents reflecting any damages caused by the alleged blacklisting in response to HRIECO's request for documents reflecting any such documents (R-144, No. 30). For these reasons, and for all of the reasons set forth above, APIIG has not established any of its claims against Sinosure.

### C. Damages

246. HRIECO has established that APIIG breached the Fifth and Sixth Supply Agreements by failing to pay for the Fifth and Sixth Shipments. Each of these 2019 Supply Agreements, and HRIECO's invoices to APIIG, required payment of $151,190 within 90 days from Bill of Lading.

247. APIIG and HRIECO stipulated to the application in this arbitration of the 9% default interest rate that is used in the State of New York, rather than the federal rate.[64]

---

[64] Hearing Tr., Aug. 16, 2022.

248.    The Bill of Lading for the Fifth Shipment issued on November 26, 2019 (R-142). Payment therefore was due 90 days later, on February 24, 2020 (C-1). Payment is 1,019 days late, i.e. from February 24, 2020 to November 9, 2022, the date of this award. Using the agreed 9% interest rate, and the calculation methodology agreed by APIIG and HRIECO,[65] $151,190 multiplied by .09 divided by 365 yields a per day rate of $37.28. The per day rate of $37.28 multiplied by 1,019 days equals interest in the amount of $37,988.32. The total amount owed for the Fifth Shipment, therefore, is $189,178.32.

249.    The Bill of Lading for the Sixth Shipment issued on December 13, 2019 (R-143). Payment therefore was due 90 days later, on March 12, 2020 (C-1). Payment is 1,002 days late, i.e. from March 12, 2020 to November 9, 2022, the date of this award. Using the agreed 9% interest rate, and the calculation methodology agreed by APIIG and HRIECO, $151,190 multiplied by .09 divided by 365 yields a per day rate of $37.28. The per day rate of $37.28 multiplied by 1,002 days equals interest in the amount of $37,354.56. The total amount owed for the Sixth Shipment, therefore, is $188,544.56.

250.    Accordingly, the total amount that APIIG owes HRIECO for breach of the Fifth and Sixth Supply Agreements is $377,722.88.

### D.    Attorneys' Fees and Expenses

251.    APIIG and HRIECO each sought an award of attorneys' fees and expenses in this arbitration and confirmed, during the hearing following closing arguments, that each party seeks an award of attorneys' fees and expenses.[66]

252.    Costs including attorneys fees and expenses incurred in connection with HRIECO's motion and hearing on its motion to dismiss the arbitration were reserved and will be considered now in determining the amounts of attorneys fees and expenses to award in this arbitration.

253.    APIIG and HRIECO submitted applications for attorneys fees and expenses on, respectively, October 22 and October 21, 2022, and were to exchange oppositions, if any. APIIG submitted opposition on November 1, 2022. HRIECO did not oppose APIIG's submission.

254.    Attorneys' fees and expenses will be awarded to the prevailing party. APIIG prevailed in opposing HRIECO's motion to dismiss the arbitration.[67] HRIECO prevailed on the merits in this arbitration.

255.    APIIG submitted an affirmation of its counsel in support of its application for its attorneys' fees and expenses, dated October 24, 2022, which annexed Exhibit A (retainer letter),

---

[65] Hearing Tr., Aug. 16, 2022; HRIECO Post-Hearing Brief, Aug. 10, 2022, p. 20, 22.
[66] Hearing Tr., Aug. 16, 2022.
[67] Orders on Motions, May 7, 2021.

Exhibit B (counsel's invoices to APIIG), Exhibit C (expert witness fees), and Exhibit D (counsel's invoices marked to show entries for, inter alia, the motion to dismiss).

256.    APIIG's submission in support of its application detailed counsel's extensive experience at the bar, including in business and commercial and other matters; demonstrated the reasonableness of counsel's hourly rate ($475 per hour) and that of the firm's associates ($375 per hour), as well as the reasonableness of the time spent in the arbitration of this matter. In addition, HRIECO did not challenge any of these submissions.

257.    APIIG's submission demonstrates that its attorneys' fees incurred in connection with HRIECO's motion to dismiss totaled $7,190.00 (13.4 hours billed at $475 per hour and 2.8 hours billed at $375 per hour). APIIG has demonstrated with this submission that its fees incurred in connection with HRIECO's motion to dismiss were reasonable and appropriate.

258.    HRIECO submitted a declaration of its counsel in support of its application for attorneys fees and expenses, dated October 21, 2022, with annexed Exhibit A (a pdf export of his time slips showing the billing in this case), Exhibit B (vendor invoice for translation services), Declaration of M. Todd Scott, Esq., and Declaration of Michon Spinelli, Esq. In addition, HRIECO's counsel advised the Arbitrator and all parties by e-mail dated October 21, 2022 forwarding the application, that 13.4 hours amounting to $6,097.00 in fees included in the application were attributable to HRIECO's motion to dismiss.

259.    HRIECO's submission in support of its application detailed counsel's extensive experience at the bar, including in business and commercial and other matters, and demonstrated the reasonableness of counsel's hourly rate, as well as the reasonableness of the time spent on the arbitration of this matter.

260.    HRIECO's counsel's hourly rate of $455 per hour is reasonable. The testimony of M. Todd Smith, Esq., and Michon Spinelli, Esq., members of the California bar, demonstrate its reasonableness and state that in their experience counsel's rate of $455 per hour is a discount to the rates charged by law firm partners for business and commercial litigation in the San Francisco bay area. In addition, APIIG does not oppose HRIECO's counsel's hourly rate.

261.    HRIECO requested $78,987.63 in attorneys' fees and $1,708.34 in expenses for its translation vendor. HRIECO's request for $78,987.63 in attorneys' fees did not include fees for mediation and settlement totaling $6,142.50 (13.5 hours), but did include fees for time spent on the motion to dismiss, totaling $6,097.00 (13.4 hours).

262.    APIIG opposed HRIECO's counsel's application in several respects, including: APIIG argued that HRIECO's counsel's fees for mediation and settlement, and for the motion to dismiss, should be excluded, and should exclude an additional 1.3 hour entry on December 15, 2020 for $591.50 in which the motion to dismiss and settlement were two of several topics that

were block billed in that entry. APIIG also argued that in the event HRIECO were to prevail in this arbitration, time spent prosecuting its counterclaims, which APIIG characterized as relating to Glucosamine, should be excluded because APIIG "never disputed those counterclaims, instead contending the amounts due for glucosamine should be offsets against Claimant's recovery against [HRIECO]."

263.    Counsel fees for mediation and settlement discussions are not part of the arbitral proceedings, and no counsel fees are awarded to any party for mediation and settlement discussions, for that reason, as previously addressed with the parties. Neither APIIG nor HRIECO sought counsel fees for mediation or settlement discussions.

264.    Similarly, as APIIG is the prevailing party on HRIECO's motion to dismiss, HRIECO is not entitled to recover its fees on that motion to dismiss. Accordingly, the amount of HRIECO's attorneys' fees on its motion to dismiss, $6,097.00 (13.4 hours), is deducted from the $78,987.63 fee amount claimed, reducing the fee amount claimed to $72,890.63. In addition, HRIECO's 1.3 hour entry on December 15, 2020 for $591.50 will be excluded from that $72,890.63 fee amount, further reducing the fee amount claimed to $72,299.13, on the basis that the entry includes time spent discussing settlement and the motion to dismiss, and it is not possible on this record to determine how much time was spent on those excluded topics as opposed to the other topics in that block entry.

265.    APIIG's remaining argument, that HRIECO's time spent prosecuting its counterclaims should be excluded relies on an incorrect interpretation of those counterclaims. Among other claims, the counterclaims allege breach of the Fifth and Sixth Supply Agreements for failure to pay for the Fifth and Sixth Shipments, allege facts relating to APIIG's claim that HRIECO had supplied adulterated Ginkgo Biloba Extract, and allege that APIIG encouraged HRIECO to ship the Fifth and Sixth Shipments in order to obtain the more valuable Glucosamine while intending not to pay the invoices for these shipments on the basis of its claim that Ginkgo Biloba Extract was "adulterated." HRIECO prevailed both on APIIG's claims and on HRIECO's counterclaims. Accordingly, HRIECO may recover $74,007.47 in attorneys' fees and expenses, the sum of its claim for attorneys' fees ($72,299.13) plus its expenses ($1,708.34).

## VIII.   AWARD

WHEREFORE, after deliberation, for the reasons set forth above, the undersigned Arbitrator DECLARES and AWARDS as follows:

1.    APIIG's claims against HRIECO are dismissed.

2.    APIIG's claims against Sinosure are dismissed.

3.      APIIG breached the Fifth and Sixth 2019 Supply Agreements by failing to pay HRIECO's invoices for the Fifth and Sixth Shipments when due and must pay to HRIECO the sum of $377,722.88 within 30 days from transmittal of this Final Award to the parties.

4.      The administrative fees and expenses of the ICDR total $36,550.00, and the compensation and expenses of the Arbitrator total $62,399.11. APIIG shall reimburse HRIECO for its incurred administrative fees and its incurred share of the Arbitrator's compensation and expenses. Therefore, APPIG shall reimburse HRIECO the amount of $29,314.93, upon demonstration by HRIECO that these incurred costs have been paid.

5.      The attorneys fees and expenses incurred by HRIECO totaling $74,007.47, shall be borne by APIIG. The attorneys fees and expenses incurred by APIIG in opposing HRIECO's motion to dismiss totaling $7,190.00 shall be borne by HRIECO. Therefore, APIIG must pay to HRIECO the sum of $ 66,817.47 within 30 days from transmittal of this Final Award to the parties.

6.      All other claims and counterclaims are denied. This Final Award is in full settlement of all claims and counterclaims submitted in this arbitration.

I hereby certify that, for purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, that this Final Award was made in New York, New York, United States of America.

**Place of Arbitration:** New York, New York
**Dated:** December 9, 2022

_____
Mary E. Bartkus, Arbitrator

I, Mary E. Bartkus, do hereby affirm upon my oath as an arbitrator, that I am the individual described in and who executed this instrument, which is my Final Award.

_____
Mary E. Bartkus

Dated: December 9, 2022